**SALT LAKE CITY, Plaintiff and Appellee,**

v.

**Mason A. OHMS, Defendant and Appellant.**

**No. 930580**

Supreme Court of Utah.

Aug. 18, 1994.

---

Cheryl D. Luke, Salt Lake City, for Salt Lake City.

David L. Sanders, Salt Lake City, for Ohms.

RUSSON, Justice:

Mason A. Ohms appeals his conviction of giving false or misleading information to a police officer, a class C misdemeanor, in violation of Salt Lake City Ordinance § 11.04.-100. We reverse and remand.

## I. FACTS

At approximately 9:30 p.m. on August 25, 1992, a disturbance involving the distribution of beer erupted in the third-level plaza area of the Delta Center. Sergeant Foster Mayo of the Salt Lake City Police Department, who was working security duty at the Delta Center, intervened and placed Mason A. Ohms under arrest for battery, a class B misdemeanor, in violation of Salt Lake City Ordinance § 11.08.020. After taking Ohms to a holding room, Sergeant Mayo asked him for identification, at which time Ohms produced a driver's license bearing the name Scott Smith. Sergeant Mayo asked Ohms if this was his driver's license and if he was Smith; Ohms answered both questions in the affirmative.

After Sergeant Mayo and other officers began the requisite paperwork using the Smith identification, one officer noticed that Ohms did not match the physical description on the driver's license. When confronted with the discrepancy, Ohms produced a second driver's license bearing his correct name. Ohms was subsequently charged with providing false or misleading information to a police officer, a class C misdemeanor.

Prior to his trial on both misdemeanor charges, Ohms signed a waiver and consent form in which he (1) acknowledged his right to a trial before a third circuit court judge with or without a jury, (2) waived that right, and (3) consented to have his case tried and final judgment entered by a circuit court commissioner.[1] Following a trial before Third Circuit Court Commissioner Sandra N. Peuler on December 15, 1992, Ohms was convicted by her of providing false or misleading information to a police officer and sentenced to three days in the Salt Lake County Jail, which sentence was suspended upon payment of a $100 fine.[2]

Ohms appealed his conviction to the Utah Court of Appeals, which certified his appeal to this court, pursuant to Utah Rule of Appellate Procedure 43(a).[3] On certification, Ohms challenges (1) the circuit court commissioner's authority to enter final judgment, and (2) the sufficiency of the evidence supporting his conviction. Salt Lake City responds that (1) Ohms, having never challenged the authority of the court commissioner below, may not raise this argument for the first time on appeal; and (2) the evidence is sufficient to support Ohms' conviction.[4]

## II. AUTHORITY OF COURT COMMISSIONERS

On certification, Ohms argues that the circuit court commissioner lacked authority to enter final judgment in his case. Specifically, he asserts that Utah Code Ann. § 78-3-31 (1992) is unconstitutional insofar as it delegates ultimate judicial power to court commissioners in violation of article VIII of the Utah Constitution. Ohms bases his argument on *Holm v. Smilowitz*, 840 P.2d 157

---

1. The waiver and consent form signed by Ohms stated:

    As defendant in the above entitled case, I acknowledge my right for a trial before a Circuit Court Judge with or without a jury. I hereby waive this right and give consent for my case to be tried and for final judgment to be entered by a Court Commissioner.

2. Commissioner Peuler held that the battery charge had not been proved beyond a reasonable doubt and therefore dismissed that charge.

3. Rule 43(a) provides, "In any case over which the Court of Appeals has original appellate jurisdiction, the court may, upon the affirmative vote of four judges of the court, certify a case for immediate transfer to the Supreme Court for determination." Utah R.App.P. 43(a).

4. Because we dispose of this case on the basis of the circuit court commissioner's lack of authority to enter judgment and impose sentence, we do not address Ohms' sufficiency of the evidence claim.

(Utah Ct.App.1992). However, while addressing similar concerns, *Holm* is distinguishable from the present case because it addresses only the authority of court commissioners to hear nonconsent civil cases.[5] The matter before us now is a criminal case involving consent.

Salt Lake City responds that since Ohms did not challenge the authority of the court commissioner or raise the constitutionality of section 78–3–31 below, he may not now raise these arguments for the first time on appeal. Alternatively, Salt Lake City contends that since Ohms (1) knowingly and voluntarily waived his right to have his case tried and final judgment entered by a third circuit court judge with or without a jury and (2) consented to have his case tried and final judgment entered by a court commissioner, he cannot now, having received an unfavorable verdict, challenge the validity of that waiver and consent.

■ As a general rule, we will review issues raised for the first time on appeal only if exceptional circumstances or "plain error" exists. *See, e.g., State v. Brown,* 853 P.2d 851, 853–54 (Utah 1992); *State v. Gibbons,* 740 P.2d 1309, 1311 (Utah 1987); *State v. Steggell,* 660 P.2d 252, 254 (Utah 1983). In the present case, or in any similar case, the only way that a defendant could challenge the constitutionality of section 78–3–31(6)(a) would be first to consent to a hearing by a commissioner and then to challenge the validity of that very consent. Such a procedure would likely be futile inasmuch as it would invariably result in the withdrawal of the consent, either by the defendant or by court order. Indeed, absent the approach taken by Ohms, it is unlikely that section 78–3–31(6)(a) would ever be subject to constitutional scrutiny. This is precisely the sort of exceptional circumstance that permits us to review the constitutionality of the provision in question. Accordingly, even though Ohms did not challenge the constitutionality of sec-

tion 78–3–31 below, we nonetheless address this argument on appeal.

■ Our analysis of the constitutionality of section 78–3–31 begins with the premise that "statutes are presumed to be constitutional." *State v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1349 (Utah 1990). As this court stated in *In re Estate of Baer:*

> The decisions of this court unanimously support a presumption of constitutionality of legislative enactments. In determining constitutionality, statutes are presumed to be constitutional until the contrary is clearly shown. It is only when statutes manifestly infringe upon some constitutional provision that they can be declared void. Every reasonable presumption must be indulged in and every reasonable doubt resolved in favor of constitutionality.

*In re Estate of Baer,* 562 P.2d 614, 616 (Utah), *appeal dismissed sub nom. Baer v. Baer,* 434 U.S. 805, 98 S.Ct. 35, 54 L.Ed.2d 63 (1977); *see also Murray City v. Hall,* 663 P.2d 1314, 1317–18 (Utah 1983) (holding that statutes " 'are endowed with a strong presumption of validity; and that they should not be declared unconstitutional if there is any reasonable basis upon which they can be found to come within the constitutional frame work [sic]' " (quoting *Greaves v. State,* 528 P.2d 805, 807 (Utah 1974))). Nonetheless, when a proper challenge to the constitutionality of a given statute is made, the said statute must be examined to determine if it is unconstitutional, either on its face or as applied. *See, e.g., In re Criminal Investigation, 7th Dist. Court No. CS–1,* 754 P.2d 633, 640 (Utah 1988); *Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 204 (Utah 1984); *Ellis v. Social Servs. Dep't of Church of Jesus Christ of Latter-day Saints,* 615 P.2d 1250, 1255 (Utah 1980).

The statute at issue in this case provides in part:

> istrates cannot enter final judgments in civil cases. However, the differences between the Utah commissioner system and the federal magistrate system nonetheless compel our nonreliance on federal case law in the present case. *See infra* note 18.

---

5. The dissent incorrectly asserts that the federal cases relied upon in *Holm* are "stale and outdated." This is simply not the case. While the cases cited in *Holm* pre-date the 1979 amendment of the Federal Magistrates Act, 28 U.S.C. §§ 631–639, they still stand for the valid legal principle that absent consent of the parties, mag-

Court commissioners are quasi-judicial officers *of courts of record* and have judicial authority as provided by this section and rules of the Judicial Council.[6]

It further states:

Upon the informed consent of the defendant, the court commissioner may conduct a jury or nonjury misdemeanor trial in accordance with the law. Upon conviction, the commissioner may impose sentence and enter final judgment. The judgment entered by the commissioner shall be the final judgment of the court for all purposes, including appeal.[7]

Article VIII, section 1 of the Utah Constitution, much like article III, section 1 of the United States Constitution, provides that the judicial power of the state shall be vested in the courts. However, unlike its federal counterpart, the Utah Constitution further delineates certain requirements concerning the selection and retention of those who will exercise that judicial power. *See* Utah Const. art. VIII, §§ 8, 9, & 13. Thus, under state law, examination of the constitutionality of section 78–3–31 consists of two inquiries: (1) whether section 78–3–31 violates the Utah Constitution's exclusive vesting of the state's judicial power in article VIII courts,[8] and (2) whether section 78–3–31 violates the Utah Constitution's requirements for those persons exercising that judicial power in courts of record.[9]

### A. Constitutional Powers of Article VIII Courts

■ Core functions or powers of the various branches of government are clearly nondelegable under the Utah Constitution.

*See, e.g., Sandy City v. Salt Lake County,* 827 P.2d 212, 221 (Utah 1992) (holding that legislative functions, such as powers of zoning and rezoning, cannot be delegated); *State v. Gallion,* 572 P.2d 683, 687 (Utah 1977) (holding that Utah Const. art. VI, § 1 limits legislature's ability to delegate legislative powers or functions to others); *In re Bridwell,* 25 Utah 2d 1, 2, 474 P.2d 116, 116 (Utah 1970) (holding that Utah Supreme Court cannot delegate its duty to discipline an erring attorney to others); *accord State v. Green,* 793 P.2d 912, 916 (Utah Ct.App.1990) (holding that "crime definition and penalty powers are essential legislative functions that cannot constitutionally be delegated by the Utah Legislature to any other person or body"). For example, a legislator cannot appoint another person to cast his or her vote on the floor of the legislature. Although a legislator can utilize assistants for various purposes, these assistants cannot exercise the legislator's voting power since such is a core legislative function. It is the legislator, not his or her staff, who is elected for that purpose, and it is the legislator who is accountable to the people.

■ Likewise, a judge cannot appoint another person to enter final judgments and orders or impose sentence. While he or she can utilize referees, court commissioners, and other assistants for various purposes, those persons cannot exercise that judge's ultimate judicial power, for such is a nondelegable core judicial function. In courts of record, it is the judge who is selected by a precise constitutional procedure to exercise judicial power, and it is the judge, not other "quasi-judicial" officers, who is subject to the ac-

---

6. Utah Code Ann. § 78–3–31(1)(a) (1992) (emphasis added).

7. Utah Code Ann. § 78–3–31(6)(a) (1992). Inasmuch as (1) commissioners are quasi-judicial employees of courts of record, as opposed to courts not of record, and (2) the commissioner in this case, in entering judgment and imposing sentence, intended to act as and for a court of record, i.e., the circuit court, this opinion addresses only the actions of commissioners in courts of record.

8. The dissent refers to this as the "institutional" dimension of judicial power.

9. The dissent states that the reasoning behind the majority opinion is that "[t]he judicial power is a personal, not an institutional, power." This is not true. The majority opinion does not adopt such a "sacred vessel" theory, as the dissent calls it, but is simply based on the constitutional provisions concerning where the judicial power of the state lies and who is qualified to exercise that power. The Utah Constitution expressly provides that the judicial power is in the courts and then clarifies that only article VIII judges can exercise that judicial power in courts of record.

countability provisions of the Utah Constitution.

Based on these principles, our present inquiry focuses on whether the authority delegated to the commissioner here involves core judicial power of a court of record.[10] "The term 'judicial power of courts' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Timpanogos Planning & Water Management Agency v. Central Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984) (quoting *Citizens' Club v. Welling*, 83 Utah 81, 90, 27 P.2d 23, 26 (1933)). Such core judicial powers include "'the *authority* to hear and determine justiciable controversies'" as well as "'the authority to enforce any valid judgment, decree or order.'" *Id.* (quoting *Galloway v. Truesdell*, 83 Nev. 13, 422 P.2d 237, 242 (1967)). Further, core judicial functions necessarily include all powers that are "necessary to protect the fundamental integrity of the judicial branch" and, as such, may not be delegated to persons other than judicial officers. *Criminal Investigation*, 754 P.2d at 642.

Article VIII, section 1 of the Utah Constitution states:

> The judicial power of the state shall be vested in a supreme court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish. The

Supreme Court, the district court, and such other courts designated by statute shall be courts of record. Courts not of record shall also be established by statute.

Thus, article VIII, section 1 specifically creates a supreme court and district courts as courts of record and gives the legislature the power to create other courts, including additional courts of record, by statute. The legislature has created circuit courts, as well as the court of appeals and juvenile courts, as additional courts of record.[11] The Utah Constitution also establishes the jurisdiction of the various state courts of record: article VIII, section 1 provides that district courts have general jurisdiction; article VIII, section 3 sets forth the jurisdiction of the supreme court, and article VIII, section 5 states that the jurisdiction of courts of record established by the legislature shall be provided by statute.[12] Moreover, article VIII's explicit vesting of jurisdiction in the various courts of the state is an implicit prohibition against any attempt to vest such jurisdiction elsewhere.

### B. Constitutional Requirements for Exercise of Judicial Power

■ The Utah Constitution specifically provides that individuals who exercise the judicial power of the state in courts of record must be selected "solely upon consideration of fitness for office without regard to any partisan political consideration," Utah Const.

---

**10.** The dissent asserts that according to our opinion, "each and every act denominated as 'judicial,'" an expression the dissent fails to define, "must necessarily be performed by an article VIII judge." This is not so. Our opinion's breadth is expressly limited to those powers that are *core judicial functions* of courts of record.

**11.** The Utah Constitution also gives the legislature the power to create courts *not* of record, which has resulted in the legislature's creation of the "justice court" system. *See* Utah Code Ann. §§ 78–5–101 to –139 (1992 & Supp.1993). The requirements outlined in our opinion do not apply to justice courts inasmuch as they are courts not of record duly created by the legislature. Article VIII, section 11 of the Utah Constitution specifies that the manner of selection, term, and qualifications of judges of courts not of record shall be provided by statute, and sections 78–5–101 to –139 delineate these criteria. However, if a party is dissatisfied with the justice court's

decision, that party is entitled to a *de novo proceeding* before the circuit court of the county. *See* Utah Code Ann. § 78–5–120 (1992); *South Salt Lake v. Burton*, 718 P.2d 405, 406 (Utah 1986). At any rate, both the Utah Constitution's and the Utah Code's provisions regarding courts not of record are immaterial to the case at bar because the legislature, by the very language of the statute creating court commissioners, did not create a new court, but merely created "quasi-judicial" officers of already existing courts of record. *See* Utah Code Ann. § 78–3–31(1)(a) (1992). Similarly, provisions in the Utah Constitution and the Utah Code governing judges pro tempore are not controlling here for the reasons set forth in Justice Howe's concurring opinion.

**12.** In accordance with article VIII, section 5, Utah Code Ann. §§ 78–4–5 and –7 (1992 & Supp. 1993) delineate the jurisdiction of the circuit courts, which includes the power and authority to decide the matter at issue in the present case.

art. VIII, § 8, and further dictates how those individuals are chosen.

Article VIII, section 8 provides that judicial appointments to courts of record are made by the governor from a list of names submitted by a judicial nominating commission,[13] which appointment must then be approved by the state senate. Only upon completion of this process can the selected individual assume the office of judge of a court of record. Even then, that judge must submit to a retention election by the electorate after serving in office for three years, and on a regular basis thereafter. Utah Const. art. VIII, § 9. Furthermore, that judge is subject to review by a judicial conduct commission, which has the power to investigate complaints and recommend sanctions where appropriate. Utah Const. art. VIII, § 13. Thus, throughout their tenure, article VIII judges of courts of record remain accountable for their actions.[14]

In short, those persons who exercise judicial power in courts of record are subject to both careful selection and continuing review as set forth in the Utah Constitution. Any attempt by either the legislature or the judicial council to transfer or assign the power of such judges to others would plainly circumvent and violate the Utah Constitution. It would deprive the judicial nominating commission of its constitutional right to select and submit judicial nominees to the governor, it would deprive the governor of the constitutional right to choose judges of courts of record, and it would deprive the people of the state of Utah of their constitutional right to vote on judges of courts of record in retention elections.

## C. Section 78-3-31

■ Returning to the statute at issue, Utah Code Ann. § 78-3-31 (1992) provides for the appointment of court commissioners to exercise the judicial authority of courts of record without subjecting them to the selection and retention requirements mandated by the Utah Constitution. Specifically, that statute states:

> Court commissioners are quasi-judicial officers of courts of record and *have judicial authority as provided by this section* and rules of the Judicial Council.[15]

The statute further provides:

> Upon the informed consent of the defendant, the court commissioner may conduct a jury or nonjury misdemeanor trial in accordance with the law. Upon conviction, the commissioner may impose sentence and enter final judgment. The judgment entered by the commissioner shall be the

---

**13.** Judicial nominating commissions are constitutionally created bodies, the composition of which is provided for by the legislature. Utah Const. art. VIII, § 8.

**14.** The dissent accuses the majority of treating article VIII as "an undifferentiated grab bag of constitutional provisions." To the contrary, our reading of article VIII treats the article as a cohesive whole. It is the dissent that is trying to "grab bag" one provision, namely section 1, and interpret it separate and apart from the rest of the article.

Moreover, because the language of article VIII is plain, it is improper to explore its legislative history, as the dissent would have us do. "The rule which should be applied is that laws, and especially foundational laws such as our Constitution, should be interpreted and applied according to the plain import of their language as it would be understood by persons of ordinary intelligence and experience." *State v. Phillips,* 540 P.2d 936, 938 (Utah 1975), *disavowed on other grounds, State v. Taylor,* 664 P.2d 439, 448 n. 4 (Utah 1983); *see also University of Utah v. Board of Examiners,* 4 Utah 2d 408, 428, 295 P.2d 348, 361 (1956) (holding that if constitutional provision is clear, "then extraneous or contemporaneous construction may not be resorted to"); *Society of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 944 (Utah 1993) (Stewart, J., dissenting) (stating that because this court is sworn to uphold language of constitution, we must enforce plain and unambiguous language contained therein); *cf. Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989) ("Where statutory language is plain and unambiguous, this Court will not look beyond the same to divine legislative intent."). The reason for such a rule is clear. It prevents judges from "finding" an ambiguity in even the most plain language of a constitutional or statutory provision as an excuse to search the legislative history in an attempt to justify an interpretation they prefer. The dissent's laborious investigation into the history of prior versions of article VIII is a prime example of such an attempt, as that information is of no analytical assistance in interpreting the plain language of current constitutional provisions.

**15.** Utah Code Ann. § 78-3-31(1)(a) (1992) (emphasis added).

final judgment of the court for all purposes, including appeal.[16]

Insofar as these sections purport to grant ultimate judicial power and authority to court commissioners in courts of record, such as the power to enter judgment and impose sentence in the case at bar, they violate article VIII of the Utah Constitution. This is true for the following reasons.

1. Article VIII, Section 8

Permitting court commissioners to perform core judicial functions, as section 78–3–31(1)(a) and (6)(a) purports to do, violates article VIII, section 8's provision that all article VIII judges of courts of record must be certified by a judicial nominating commission to the governor, who then makes the appointment with the approval of the state senate. While court commissioners, as "quasi-judicial officers," Utah Code Ann. § 78–3–31(1)(a) (1992), may perform many important functions in assistance to courts of record,[17] they are not duly appointed judges and thus may not exercise core judicial functions without violating article VIII of the Utah Constitution. Court commissioners are employees of the judiciary, not duly appointed judges. There are no provisions which subject them to the constitutional checks and balances imposed upon duly appointed judges of courts of record. Similarly, while court commissioners are, under present statutory law,

---

**16.** Utah Code Ann. § 78–3–31(6)(a) (1992).

**17.** As adjuncts of the court to which they are appointed, court commissioners are authorized to exercise certain functions to assist the court in the exercise of its core judicial powers. For example, Utah Code Ann. § 78–3–31(9) (1992) provides that the judicial council establish the types of orders and relief commissioners may *recommend*. Such provisions are constitutionally sound, since ultimate decision making remains with the judge.

The dissent claims that our decision today is contrary to almost thirty years of historical support for the use of commissioners. This is simply not true. Court commissioners have provided a valuable service to the judiciary for over thirty years pursuant to constitutionally valid statutes. They have conducted fact-finding hearings, held pretrial conferences, made recommendations to judges, and provided counseling and other worthwhile functions. However, over that thirty-year period, commissioners were never allowed to perform ultimate or core judicial functions such as entering final orders and judgments or imposing sentence. In every case, commissioner actions led to recommendations which resulted in final review and signature by a judge. It was not until April 1990 that the current version of section 78–3–31 became effective, giving rise to *Holm v. Smilowitz*, 840 P.2d 157 (Utah Ct.App.1992), and the present case.

For example, prior to the 1990 amendment of that section, the Utah Code section addressing mental health commissioners provided:

In any case in which the court refers an application to the commissioner, the commissioner shall promptly cause the proposed patient to be examined and, on the basis of that examination, shall either *recommend* dismissal of the application or hold a hearing, as provided in this part, and make findings of fact and *recommendations* to the court regarding the order for involuntary commitment of the proposed patient.

Utah Code Ann. § 62A–12–233(2) (1989) (emphasis added). Thus, prior to April 1990, mental health commissioners had authority to hold hearings and make findings and recommendations to the court, duties which our decision today does not impact, but they did not, and constitutionally cannot, have authority to sign final court commitment orders.

Likewise, with respect to domestic relations, prior to the ill-advised 1990 amendment of section 78–3–31 which granted them the power to enter final judgments and orders, court commissioners had the authority to "require the personal appearance of parties and their counsel," "require the filing of financial disclosure statements and proposed settlement forms by the parties," "obtain child evaluations," "make *recommendations* to the court regarding any issue in domestic relations and spouse abuse cases," "keep records, compile statistics, and make reports as the courts may direct," and require counsel to file certain certificates with the pleadings. Utah Code Ann. § 30–3–4.2 (1989) (emphasis added). Further, court commissioners had the duty to "review all pleadings in each case," "certify all cases directly to the court which [did] not appear to require further intervention by the commissioner," "conduct hearings with parties and their counsel present . . . for the purpose of submitting *recommendations* to the court," "provide any other information or assistance to the parties as appropriate," "coordinate information with the juvenile court," "refer appropriate cases to mediation programs," and "adjudicate default divorces." Utah Code Ann. § 30–3–4.3 (1989) (emphasis added). With the possible exception of adjudicating default divorces, which is not before the court today, all of these functions may still be properly exercised by commissioners. Thus, our decision in no way affects the authority and functions that court commissioners have en-

subject to continuing review by a judicial conduct commission, see Utah Code Ann. § 78–3–31(8)(b) (1992), they are not constitutionally subject to such review, nor are they subject to judicial retention elections that do apply to judges of courts of record. Utah Const. art. VIII, §§ 9 & 13.[18]

### 2. Separation of Powers

Permitting the legislature to grant court commissioners authority to enter final judgment and impose sentence violates the separation of powers doctrine. The dissent argues that since, under the court commissioner system, the judicial power is being delegated to persons entirely within the control of the judiciary, there is no separation of powers problem. However, their argument misses the point. By granting commissioners "judicial authority *as provided by this section*," Utah Code Ann. § 78–3–31(1)(a) (1992) (emphasis added), the legislature has assumed the right to vest commissioners with judicial power and define the bounds of commissioner authority. The very attempt by the legislature to designate an individual other than a duly appointed judge to wield ultimate judicial power is, in and of itself, a violation of the separation of powers doctrine. Oversight of that individual by the judiciary is irrelevant because of the constitutional requirement that only duly appointed judges exercise ultimate judicial power in courts of record.[19]

### 3. Subject Matter Jurisdiction

Subject matter jurisdiction is "the authority and competency *of the court* to decide the case." *Department of Social Servs. v. Vijil,*

---

joyed for over thirty years and will undoubtedly continue to enjoy in the future.

**18.** We recognize that in the federal system, various circuit courts have found an arguably similar provision involving magistrates constitutional. *See, e.g., United States v. Ferguson,* 778 F.2d 1017 (4th Cir.1985), *cert. denied sub nom. Wilson v. United States,* 476 U.S. 1123, 106 S.Ct. 1990, 90 L.Ed.2d 671 (1986); *United States v. Dobey,* 751 F.2d 1140 (10th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985); *United States v. Byers,* 730 F.2d 568 (9th Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 333, 83 L.Ed.2d 270 (1984). However, the differences between Utah's judicial system and the federal system dictate a different result here. First, the Utah judiciary, unlike its federal counterpart, is subject to numerous procedures which provide for certification by a judicial nominating commission, Utah Const. art. VIII, § 8, retention elections, Utah Const. art. VIII, § 9, and review by a judicial conduct commission, which has the power to investigate complaints and recommend sanctions where appropriate. Utah Const. art. VIII, § 13. Second, in criminal matters, the federal system requires not only that the defendant consent to the magistrate trying the case, but that the prosecution and the district court consent as well. Under the Utah system, neither the consent of the State nor the consent of the trial court is required in order to transfer a case to a commissioner. Third, under the federal magistrate system, a defendant must appeal the matter heard by the magistrate to the district court prior to appealing to a United States court of appeals. 18 U.S.C. § 3402. This procedure allows the district court to maintain control over the magistrate and guarantees that the appeal to the United States court of appeals has been reviewed and ruled on by a district court judge, neither of which is provided for under the Utah commissioner system. Fourth, the federal cases which hold that magistrates may enter judgment and pass sentence in criminal misdemeanor cases with the consent of the defendant uniformly rely on the fact that the district court retains control over the magistrate, control which is not present under the Utah commissioner system. *See Ferguson,* 778 F.2d at 1019; *Dobey,* 751 F.2d at 1142; *Byers,* 730 F.2d at 570. Lastly, federal statutes also support the proposition that a federal district judge must remain ultimately responsible over matters heard by magistrates, responsibility which is not provided for under section 78–3–31. *See, e.g.,* 28 U.S.C. § 636(b)(1)(A).

Furthermore, the dissent's argument, based on *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,* 725 F.2d 537 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984), that this right is one personal to the defendant and therefore subject to waiver plainly ignores "the people's" right to have cases tried in courts of record before article VIII judges who are subject to retention elections.

**19.** The dissent asserts that since section 78–3–31 grants court commissioners ultimate judicial authority only in misdemeanor cases with consent of the defendant, it is constitutional. However, the broad language of section 78–3–31(1)(a) that court commissioners "have judicial authority *as provided by this section* and rules of the Judicial Council," Utah Code Ann. § 78–3–31(1)(a) (1992) (emphasis added), if valid, would allow either the legislature or the judicial council to expand the authority of court commissioners at will. There would be nothing to prevent the legislature from amending section 78–3–31 to utilize court commissioners to enter final judgments in any type of case, even capital murder cases, or to adjudicate nonconsent cases. Although the dissent argues

784 P.2d 1130, 1132 (Utah 1989) (emphasis added) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (1969)). The jurisdiction of circuit courts is set forth in Utah Code Ann. §§ 78–4–5 and –7 (1992 & Supp.1993) and clearly includes the power and authority to decide the matter at issue in the present case. Thus, the third circuit court had jurisdiction in this case.

However, that does not resolve the question of whether the individual exercising that court's jurisdiction had the authority to do so. Although the language of article VIII, section 5 grants the legislature authority to bestow jurisdiction on statutorily created courts, *City of Monticello v. Christensen*, 788 P.2d 513, 518 (Utah), *cert. denied*, 498 U.S. 841, 111 S.Ct. 120, 112 L.Ed.2d 89 (1990), it does not give the legislature the discretion to determine who has the authority to exercise that jurisdiction. Thus, while the *circuit court* clearly had jurisdiction to decide this matter, it does not necessarily follow that the *circuit court commissioner* had authority to enter judgment and impose sentence in her capacity as a circuit court commissioner.

By enacting section 78–3–31(1)(a) and (6)(a), the legislature has attempted to grant authority to enter final judgments and impose sentence in courts of record to nonjudges, in violation of article VIII of the Utah Constitution. Such a grant is plainly unconstitutional because, pursuant to article VIII,

only judges may enter judgments and impose sentence in courts of record since they are the only judicial officers constitutionally appointed to perform such functions. Moreover, as stated in Justice Howe's concurring opinion, the fact that Ohms signed a waiver and consent form is irrelevant to our analysis because "it [was] not within his power to invest by a 'waiver' the right to perform core judicial duties in persons to whom that right has not been granted by [article VIII,] section 4." Accordingly, we conclude that section 78–3–31 violates the Utah Constitution insofar as it attempts to vest authority to enter final judgments and impose sentence in criminal misdemeanor cases, which are core judicial functions, upon persons other than article VIII judges.[20]

## III. DE FACTO AUTHORITY

■ However, because the circuit court to which the commissioner was assigned had jurisdiction to decide this matter, we must address Commissioner Peuler's authority to hear this case as a "judge de facto" of the third circuit court.

A judge de facto is defined as:

One who holds and exercises the office of a judge under color of lawful authority and by a title valid on its face, though he has not full right to the office, *as where he was appointed under an unconstitutional statute*, or by an usurper of the appointing power, or has not taken the oath of office.

that such a danger is unlikely, the purpose of a constitution is to assure that it *never* happens.

**20.** We also note that our conclusion is supported by other states with commissioner systems. *See, e.g., State ex rel. Smith v. Starke Circuit Court*, 275 Ind. 483, 417 N.E.2d 1115, 1121–23 (1981); *K.C. v. State*, 771 P.2d 774, 777–78 (Wyo.1989). Additionally, other jurisdictions have determined that judicial power is to be exercised solely by judges and thus cannot be delegated to any other group or person. *See, e.g., In re Santa Cruz*, 8 Ariz.App. 349, 446 P.2d 253, 255 (1968); *C.C.C. v. District Court for Fourth Judicial Dist.*, 188 Colo. 437, 535 P.2d 1117, 1119 (1975); *General Motors Corp. v. Erves*, 399 Mich. 241, 249 N.W.2d 41, 49 (1976); *Lewis v. Texas Dep't of Pub. Safety*, 407 S.W.2d 855, 856 (Tex.Civ.App. 1966).

For example, the Wyoming Supreme Court has specifically held that "[t]he district court cannot delegate the power to hear, try, or determine a case to a court commissioner." *K.C.*, 771 P.2d at

778. The reason for such a rule is plain: "Simply put, '[g]eneral court commissioner responsibilities as a hearing examiner cannot be outspread, absent expansion of constitutional authorization, to include power of decisional finality within present constitutional terms. The differentiation is between adjunct fact finding and plenary judicial responsibility.'" *Id.* (quoting *Foster v. Foster*, 768 P.2d 1038, 1042 (Wyo.1989) (Urbigkit, J., specially concurring)).

Similarly, the Indiana Supreme Court has stated that the state legislature is forbidden to vest commissioners with judicial duties that, under the Indiana constitution, only judges are allowed to exercise. *Smith*, 417 N.E.2d at 1121–23. "'A master commissioner is not a court, and judicial duties which courts only can exercise, can not be conferred upon him.'" *Id.* at 1121 (quoting *Shoultz v. McPheeters*, 79 Ind. 373, 376 (1881)); *see also Rivera v. State*, 601 N.E.2d 445, 446 (Ind.Ct.App.1992) (holding that "a commissioner acts as an instrumentality to inform and assist the court; only the court has authority to make final orders or judgments").

*Black's Law Dictionary* 841 (6th ed. 1990); *see also State ex rel. Farmer v. Edmonds Mun. Court,* 27 Wash.App. 762, 621 P.2d 171, 175 (1980) (holding that when a judicial office "is created by legislative act or municipal ordinance ... the office is regarded as a de facto office until the act or ordinance is declared invalid"); *accord O'Neill v. O'Neill,* 420 So.2d 261, 263 (Ala.Civ.App.), *aff'd sub nom. Ex Parte O'Neill,* 420 So.2d 264 (Ala. 1982); *Mitchell Mill Remnant Corp. v. Long,* 223 Ky. 242, 3 S.W.2d 639, 639 (1928); *Sheldon v. Green,* 182 Okla. 208, 77 P.2d 114, 115–16 (1938).

This court has defined an officer de facto as follows:

"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised,

First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.

Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

*Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such.*"

*Vance v. Fordham,* 671 P.2d 124, 131 n. 5 (Utah 1983) (emphasis added) (quoting *State v. Carroll,* 38 Conn. 449, 471–72 (1871)), *cert. denied sub nom. Vance v. Utah,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also State v. Menzies,* 845 P.2d 220, 226

(Utah 1992) (stating that under de facto officials doctrine, persons "may be considered de facto officials if they assume official authority under color of a valid appointment and public acquiescence in the authority"); *Hussey v. Smith,* 99 U.S. 20, 24, 25 L.Ed. 314 (1878) (stating that "[a]n officer *de facto* is not a mere usurper, nor yet within the sanction of law, but one who, *colore officii,* claims and assumes to exercise official authority, is reputed to have it, and the community acquiesces accordingly"); *accord* 46 Am.Jur.2d *Judges* § 243 (1969). Although *Vance* did not specifically address judges de facto, but rather a member of a committee recommending revocation of the license of a doctor who lacked statutory qualification, the court nonetheless stated in broad language that when an officer lacks authority to perform the duties he or she has performed but acts as an officer de facto, the action taken by that officer is valid. *Vance,* 671 P.2d at 130–31.

Also of note is this court's decision in *In re Thompson's Estate,* 72 Utah 17, 269 P. 103 (1927), which rejected a petition for rehearing that objected to a district judge's sitting on the state supreme court following a justice's death but before a new justice was named and sworn in. The court held that the district judge had, at least, de facto authority to sit with the supreme court, given that (1) the district judge had authority in other instances to sit with the court, and (2) the parties had knowledge of and did not object to the district judge's participation. *Id.* at 87, 269 P. at 128.

In light of the above authority, it is clear that although the statute granting commissioners authority to enter final judgments and impose sentence must be declared unconstitutional, actions taken by commissioners in the past are not subject to challenge since court commissioners in those cases acted with de facto authority. *See, e.g., Farmer,* 621 P.2d at 175 (holding that judgments rendered by courts not having authority to enter such are not subject to collateral attack because judges entering those judgments were de facto officers).

However, it would be unconscionable to deprive Ohms, who has sustained the bur-

den of attacking an unconstitutional statute, of the fruits of victory, thereby discouraging challenges to statutes of questionable validity. *See Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 196 (Utah 1984). In cases like the one at bar, "considerations of judicial integrity require us to extend the benefit of our decision to [the] petitioner." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 914 (Utah 1993). Accordingly, we do not apply the de facto authority doctrine to Ohms' case. *See Rio Algom Corp.*, 681 P.2d at 196.

## IV. CONCLUSION

In conclusion, we hold that Utah Code Ann. § 78–3–31 (1992) is unconstitutional to the extent that it purports to vest ultimate judicial power of courts of record in persons who have not been duly appointed as article VIII judges pursuant to the requirements of the Utah Constitution. Specifically, we hold that section 78–3–31 violates the Utah Constitution by granting commissioners the ultimate judicial power of entering final judgments and imposing sentence in criminal misdemeanor cases. Ohms' conviction is reversed, and this matter is remanded for further proceedings consistent with this opinion.

STEWART, Associate C.J., concurs.

HOWE, Justice, concurring:

I concur. I write to express an additional basis for the conclusion reached in the majority opinion.

In article VIII, section 4 of the Constitution of Utah, express provision is made for two instances in which judicial duties may be performed by someone other than an active article VIII judge or justice. That section provides in part:

Except as otherwise provided by this constitution, the Supreme Court by rule may authorize retired justices and judges

and judges pro tempore to perform any judicial duties. Judges pro tempore shall be citizens of the United States, Utah residents, and admitted to practice law in Utah.

The quoted language is new language contained in the 1984 amendment to article VIII.[1] It seems reasonable to assume that the drafters of the amendment and the electorate when they adopted it contemplated that situations would arise in which an active article VIII judge or justice might not be available to perform a judicial duty or that overloaded calendars would sometimes require additional judicial assistance. Thus, provision was made in section 4 for this court by rule to authorize retired justices and judges, and judges pro tempore "to perform any judicial duties."[2]

A well-recognized and often relied-upon rule of construction of language in statutes and constitutions is the maxim *expressio unius est exclusio alterius*. *Hansen v. Wilkinson*, 658 P.2d 1216, 1217 (Utah 1983) (" 'It probably is not wholly inaccurate to suppose that ordinarily when people say one thing they do not mean something else.' " (quoting 2A C. Sands, *Sutherland Statutory Construction*, § 47.01 (4th ed. 1973))). In construing constitutional provisions, the rule has been stated by various courts in different ways. For example, in *State ex rel. O'Connell v. Slavin*, 75 Wash.2d 554, 559, 452 P.2d 943, 946 (1969), the court stated the rule as follows:

For purposes of constitutional interpretation, the express mention of one thing implies exclusion of another which might logically have been considered at the same time.

In *In re Investigation of a Circuit Judge of the Eleventh Judicial Circuit of Florida*, 93 So.2d 601, 606 (Fla.1957), the same rule was stated:

tion made in section 2 that when a justice of the supreme court is disqualified or otherwise unable to participate in a cause before the court, an *active* judge from an appellate court or the district court shall be called to sit on the supreme court. A retired justice or judge or a judge pro tempore may not be used for that purpose.

---

1. Prior to the amendment, judges pro tempore were authorized to try causes only in the district court and upon agreement of the parties or their counsel. There was no provision respecting retired judges or justices. Utah Const. art. VIII, § 5 (1945).

2. The words "[e]xcept as otherwise provided by this constitution" in section 4 refer to an excep-

[W]here the constitution expressly provides the manner of doing a thing, it impliedly forbids it being done in a substantially different manner.

The Supreme Court of Arizona in *Whitney v. Bolin*, 85 Ariz. 44, 330 P.2d 1003, 1005 (1958), stated the rule as follows:

[T]he enumeration of specified things in a constitution will usually be construed to exclude all other things not so numerated.

Finally, in *Village of Perrysburg v. Ridgway*, 108 Ohio St. 245, 253, 140 N.E. 595, 597 (1923), the court wrote that "express delegations of political power are made through constitutional provisions and are necessarily exclusive delegations of power, unless it be expressly provided otherwise." *See also Peck v. State*, 63 Idaho 375, 120 P.2d 820, 822 (1941) (citing another expression of the rule).

The rule has been applied in construing constitutional provisions in a wide variety of situations. One such instance is in the construction of constitutional provisions prescribing the qualifications of candidates for public office. In *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the United States Supreme Court held that the House of Representatives could not add to the qualifications specified in the Constitution to serve as a House member. Similarly, in *Whitney*, 330 P.2d at 1004–05, article VI, section 13 of the Arizona Constitution prescribed the qualifications for justices of the supreme court. The legislature added by statute that no incumbent of an elective office shall be eligible for nomination or election to any office other than the office held. The court held that the legislature cannot add other qualifications or restrictions to those enumerated in the constitution for justices. *Id.* at 1005–06. Recently, the Arkansas Supreme Court in *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349, *cert. granted*, — U.S. ——, 114 S.Ct. 2703, 129 L.Ed.2d 832 (1994), held that an amendment to the Arkansas Constitution which imposed term limits on United States senators and representatives elected in Arkansas was unconstitutional in that it added qualifications to those stated in the United States Constitution.

The rule has also found application in cases construing constitutional provisions dealing with removal of public officers from office. In *In re Investigation of a Circuit Judge*, the court held that where the constitution creates an office, fixes its term, and provides the conditions under which the incumbent may be removed before expiration of his or her term, neither the legislature nor any other authority has power to remove or suspend such officer in any manner other than that provided by the constitution. 93 So.2d at 604. Likewise, in *State v. Patterson*, 181 Ind. 660, 105 N.E. 228 (1914), the Constitution of Indiana provided that any judge or prosecuting attorney who is convicted of corruption or other high crime may be removed from office by the supreme court. It was held in that case that the legislature lacked the power to prescribe by statute that a prosecuting attorney could also be removed for neglect of duty. In that case, the court wrote:

In construing constitutional provisions, a rule of general acceptance is "that which is expressed makes that which is silent to cease." When the constitution declares how a right may be exercised, it impliedly prohibits its exercise in some other way.

The rule is expressed by Cooley as follows: "When the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition or to extend the penalty to other cases." Cooley's Const. Lim. 64.

*Patterson*, 105 N.E. at 229 (citations omitted).

Because of the foregoing well-reasoned authorities, I am led to conclude that article VIII, section 4 provides the exclusive means by which the authority to perform judicial duties may be delegated to a person other than an active article VIII justice or judge, to wit, "the Supreme Court by rule may authorize retired justices and judges and judges pro tempore to perform any judicial duties." Utah Const. art. VIII, § 4. I agree with the majority that the legislature is not free to authorize by statute other persons, such as commissioners, to enter final judg-

ments and impose sentence in criminal misdemeanor cases or perform other core judicial functions.

In 1984 when article VIII was amended by the electorate to include the above-quoted language, commissioners did not try misdemeanor cases. Only seven years earlier in 1977, city judges had been automatically made circuit judges and a statewide circuit court system had come into place. The trial and sentencing of persons charged with misdemeanors was a major part of circuit court work. Because all city judges holding office as of July 1, 1977, automatically became state circuit court judges, some parts of our state had more circuit judges than the case load at that time required. With this backdrop of conditions which existed in 1984, it is readily understandable that the above-quoted provision in section 4, which was new language, was thought to be broad enough to accommodate any future increased need for judicial duties to be performed by anyone other than an active article VIII judge or justice. Thus, retired justices and judges and judges pro tempore were the only persons authorized in section 4 to perform judicial duties and only then, when authorized by rule of the supreme court (not by the legislature).

It is of no consequence that article VIII, section 1 vests judicial power in courts, not in judges, as argued by Chief Justice Zimmerman and Justice Durham in their dissenting opinion. Although judicial power may be vested in courts, section 4 allows that power to be exercised, i.e., allows "judicial duties" to be performed, only by article VIII judges and by retired justices and judges and by judges pro tempore when authorized by the supreme court.

Since section 4 carefully delineates and limits the persons who may perform judicial duties, no one can circumvent that limitation by voluntarily agreeing that someone else can "perform judicial duties" in his or her case. While a criminal defendant can waive a *personal* right afforded him, such as the right to a speedy trial, the right against self-incrimination, and the right to a jury trial, it is not within his power to invest by a "waiv-er" the right to perform core judicial duties in persons to whom that right has not been granted by section 4.

Finally, because the wording of section 4 is unique to our constitution, the federal cases upholding the magistrate system in the federal court system relied upon in the dissenting opinion are not on point.

Thus, I conclude that in addition to the reasons given in the majority opinion, the statute at issue in the instant case, Utah Code Ann. § 78–3–31, violates article VIII, section 4 of the constitution to the extent that it authorizes court commissioners to perform core "judicial duties." Clearly, the trial and sentencing of the defendant in the instant case is a core "judicial duty." The statute further violates section 4 because it provides for the appointment of court commissioners by the judicial council in derogation of the right of the supreme court by rule to authorize certain persons to perform core judicial duties who are not active article VIII judges or justices.

I therefore join in the reversal of defendant's conviction.

STEWART, Associate C.J., and RUSSON, J., concur in the concurring opinion of HOWE, J.

DURHAM, Justice, and ZIMMERMAN, Chief Justice, dissenting:

Today the majority takes a grave misstep. In an opinion that reflects a fundamental misunderstanding of the Utah constitutional provisions relating to the selection and retention of article VIII judges, the majority reaches the erroneous conclusion that only persons who have been selected and retained by the methods described in article VIII are constitutionally capable of exercising "the judicial power" of the state of Utah. In essence, the majority "constitutionalizes" a concept of the article VIII judge as a kind of "sacred vessel" in whose person is contained the entire quantum of the judicial power. The majority's conclusion lacks precedential support[1] and, more important, is not re-

1. In footnote 20 of the majority opinion, the majority claims that its conclusion is supported

by the decisions of other states. The state law upon which the majority opinion relies, however,

quired by either the text or the history of article VIII. Because article VIII's judicial selection and retention provisions were never intended to delimit who may exercise judicial power and because the article VIII judiciary retains complete control over the commissioner system, we believe that section 78–3–31(6) of the Utah Code is not an unconstitutional delegation of the judicial power.

## I. NATURE, HISTORY, AND FUNCTION OF THE JUDICIAL POWER AND THE JUDICIAL SELECTION AND RETENTION PROVISIONS

Justice Russon, writing for the majority, asserts that the constitutional provisions relating to the selection and retention of judges of courts of record create the necessary prerequisites for the legitimate exercise of the judicial power.[2] The majority's reasoning is as follows: The judicial power is a personal, not an institutional, power, embodied in and able to be exercised only by an individual judge; the constitution, by providing for specific methods of selection and retention of

judges of courts of record, limits the persons who may exercise the judicial power. This "sacred vessel" theory fails because (i) the judicial power addressed by the constitution's vesting provisions is institutional rather than personal; (ii) the judicial selection and retention provisions of the constitution are not textually linked to article VIII, section 1 and have never in a hundred years of Utah constitutional history been considered or construed to be inextricably connected to the exercise of the judicial power in any defining way, nor is there any evidence that the framers intended such a connection; and (iii) the constitution provides for the creation of non-record courts by the legislature and for the appointment of pro tempore judges (both of which are clearly understood to be constitutionally capable of exercising the judicial power), with no corresponding requirement that these judicial officers be subject to the selection and retention requirements for judges of record courts. Thus, while the selection and retention provisions certainly create a constitutional requirement for an

---

is largely inapposite. For example, the majority points to *State ex rel. Smith v. Starke Circuit Court*, 275 Ind. 483, 417 N.E.2d 1115, 1121–23 (1981), for the proposition that judicial powers cannot be vested in officers such as commissioners appointed by judges of the courts. While that language is contained in *Smith*, the Indiana court refused to set aside the order in question because the appellant had failed to object to the authority of the commissioner at the trial level. *Id.* at 1123–24; *see also Bivins v. State*, 485 N.E.2d 89, 92 (Ind.1985) (asserting that first question court should consider in cases such as the one at hand is whether "[a]ppellant waived his right to challenge [the] selection" of a commissioner or special judge); *Rodgers v. Rodgers*, 503 N.E.2d 1255, 1257 (Ind.Ct.App.1987) ("The authority of one who acts as judge *de facto* under color of authority cannot be collaterally attacked.... Where a party does not object to an irregularity in the appointment of a special judge, he accepts the appointment, submits to the jurisdiction, and waives the irregularity." (citations omitted)). Furthermore, many of the cases cited in the majority opinion rely for their analysis on constitutional and *statutory* grounds, invalidating certain uses of commissioners largely because they fail to follow a statutorily prescribed scheme. *See, e.g., In re Santa Cruz*, 8 Ariz.App. 349, 446 P.2d 253, 254–55 (1968); *C.C.C. v. District Court for the Fourth Judicial Dist.*, 188 Colo. 437, 535 P.2d 1117, 1119 (1975) (en banc); *Lewis v. Texas Dep't of Pub. Safety*, 407 S.W.2d 855, 856 (Tex.Civ.App. 1966). Even the Indiana Supreme Court in *Smith*,

after striking down a statute which purported to "give ... appointed commissioners the full scope of powers held by [a] regular ... judge," went on to observe that "the appointment of a [commissioner] by a circuit court judge is not necessarily constitutionally improper." 417 N.E.2d at 1118, 1123. The court pointed out that if proper limitations on authority were observed, the use of commissioners was proper, and specifically approved the extant use in Indiana of referees, probate commissioners, masters, and judges in small claims courts. *Id.* at 1124.

**2.** It is interesting to note that the majority opinion is not Justice Russon's first opportunity to comment on Utah's commissioner system. In *Holm v. Smilowitz*, 840 P.2d 157, 165–68 (Utah Ct.App.1992), then Judge, now Justice, Russon indicated in dicta that Utah's commissioner system was unconstitutional to the extent that it allowed court commissioners to "exercise ultimate judicial power." In reaching this result, Justice Russon relied almost exclusively on federal case law, case law that turned out to be stale and outdated. Now, after the federal case law upon which he previously relied has proven to be inapposite, Justice Russon relies on a new rationale to strike down Utah's commissioner system—the selection and retention provisions contained in article VIII. The conclusion reached by Justice Russon and the majority appears to be a result in search of a reason.

individual to acquire the *status of a judge of a court of record*, they just as certainly do *not* circumscribe the limits of legitimate exercise of the judicial power within either record or nonrecord courts.

## A. Nature of the Judicial Power

It is the province of the judicial branch of government to interpret the law. As a necessary incident to this role, the judiciary is empowered to " 'hear and determine controversies between adverse parties and questions in litigation.' " *Timpanogos Planning & Water Management Agency v. Central Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984) (quoting *Citizens Club v. Welling*, 83 Utah 81, 90, 27 P.2d 23, 26 (1933)).[3] This judicial power includes " 'the *authority* to hear and determine justiciable controversies.... [It] includes the authority to enforce any valid judgment, decree or order.' " *Id.* (quoting *Galloway v. Truesdell*, 83 Nev. 13, 422 P.2d 237, 242 (1967)).

Pursuant to article VIII, section 1 of the Utah Constitution, "[t]he judicial power of the state shall be vested in a Supreme *Court*, in a trial *court* of general jurisdiction ...," and in such other *courts* as the Legislature by statute may establish." Utah Const. art. VIII, § 1 (emphasis added). The majority opinion mistakenly incorporates into article VIII, section 1 the notion that the judicial power belongs exclusively to individual *judges* rather than being vested, as the constitution specifically provides, in the *courts*. Even the functions that the majority refers to as "core judicial functions," such as conviction and sentencing in criminal cases, cannot be characterized as the exercise of personal or individual power. The power in question is the institutional power that the constitution vests in the courts. When individual

judges perform their functions, they are the media through which the judicial power "flows" or is manifested, but they do not "constitute" such power in and of themselves.

An individual judge adjudicates guilt, orders the entry of conviction, and imposes sentence. But until the judge's order has been reduced to writing and has been duly filed and placed in the court's records by auxiliary court staff, it is essentially meaningless. It cannot be enforced or relied upon as a legal basis for a deprivation of liberty. *See* Utah R.Crim.P. 22(d). Likewise, in civil adjudications, a judgment, although duly decided and ordered by an individual judge, must be filed and entered in the court's docket before it becomes legally binding upon any person or eligible for appellate review. *See* Utah R.Civ.P. 58A(a)–(c); *In re Bundy's Estate*, 121 Utah 299, 241 P.2d 462, 467 (1952) ("[A] judgement is complete and is deemed entered for all purposes when the same is signed *and filed....*" (emphasis added)). The majority opinion has diminished and misunderstood the judicial power by ignoring its institutional character as reflected in the language of article VIII, section 1. The majority instead insists that the personal power of the individual judge circumscribes the whole of the "judicial power of the state." This cannot be so. Judges exercise in specific ways the judicial power that belongs to the institutions they serve. They are not the source or sole repositories of that power.

In adopting the "sacred vessel" theory, the majority paints itself into an analytical corner. It repeatedly insists that the exercise of the judicial power is limited to those persons who, like themselves, are appointed to the bench and retained in office pursuant to article VIII, sections 8, 9, and 13. Taken to

3. In his treatise on Utah constitutional law, Professor Martin Hickman comments that the *Welling* definition is probably incomplete:

> At federal law, the term "judicial power" embraces not only the "right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction," but also the power: "to punish for contempt of their authority, to issue writs in aid of jurisdiction when authorized by statute, to make rules governing their process in the absence of statutory authorization or prohibi-

tions; inherent equitable powers over their own process to prevent abuse, oppression and injustice, and to protect their own jurisdiction and officers in the protection of property in custody of law, the power to appoint masters in chancery, referees, auditors, and other investigators; and to admit and disbar attorneys."

Martin B. Hickman, Utah Constitutional Law 135–36 (1954) (unpublished Ph.D. dissertation, University of Utah) (quoting *United States Constitution, Revised and Annotated* 511–12 (1953)).

its logical conclusion, the majority approach mandates that each and every act denominated as "judicial" must necessarily be performed by an article VIII judge. Perhaps realizing the crushing burden that such a result would impose on the judiciary of this state, the majority attempts to qualify its absolutist approach, limiting the breadth of its opinion to "powers that are *core judicial functions* of courts of record." [4] Maj.Op. at 848. The majority moves on to assert that commissioners may continue to perform most of the functions they currently perform as long as "ultimate decision-making" authority remains with the judge.[5]

The majority's "compromise" defies logic. If in fact, as the majority asserts, the judicial selection and retention provisions contained in article VIII, sections 8, 9, and 13 do serve as a prerequisite for the exercise of the "judicial power of the state of Utah," every judicial act, not just "core judicial functions," must be performed by a judge. To conclude otherwise would, in the words of the majority,

> plainly circumvent and violate the Utah Constitution. It would deprive the judicial nominating commission of its constitutional right to select and submit judicial nominees to the governor, it would deprive the governor of the constitutional right to choose judges of courts of record, and it would deprive the people of the state of Utah of their constitutional right to vote on judges of courts of record in retention elections.

Maj.Op. at 850.

We think it is far more logical to read the language of article VIII, section 1 in accord with its plain meaning—the judicial power of

the state of Utah shall be vested in the "courts." Under this reading of article VIII, section 1, all judicial power, not just "core judicial functions," must remain firmly under the control of the judiciary. Because section 78–3–31 operates in harmony with this constitutional mandate, we would uphold its validity.

### B. Textual and Historical Analysis of Judicial Selection and Retention Provisions

The lack of any meaningful textual or historical analysis in the majority opinion further demonstrates the fallacy of the "sacred vessel" theory. The majority has simply created a theory out of whole cloth by treating article VIII as if it were an undifferentiated grab bag of constitutional provisions. To locate a basis in reason supporting its desired result, the majority appears to have arbitrarily seized upon the judicial selection and retention provisions found in sections 8, 9, and 13. The majority, however, fails to provide any textual analysis to support a connection between these provisions and its notions about the judicial power. The reason the majority opinion fails in this respect is quite clear—no textual support exists. Article VIII, section 1 does not state that it is conditioned by article VIII, sections 8, 9, and 13, nor do these latter provisions refer to the judicial power or even mention article VIII, section 1.

The majority opinion also fails to subject its "sacred vessel" theory to even a cursory historical analysis. The reason is again quite clear—no historical support exists. The Utah Constitution's judicial selection and retention provisions have undergone two amendments since the constitution was draft-

---

**4.** The majority does not cite to any constitutional provision in support of its distinction between "core" and "noncore" judicial functions. Article VIII, section 1 specifically provides that the "judicial power" shall be vested in the "courts." The term "core judicial functions" does not appear anywhere in the Utah Constitution. Indeed, the term is unknown to the legal lexicon.

**5.** Implicit in this assertion is the notion that most of the functions exercised by court commissioners are not exercises of the "judicial power of the state of Utah," for if these functions were exercises of judicial power, they would have to be

exercised by the judge rather than by a commissioner. If these functions are not, in fact, exercises of the judicial power, the legislature is free to assign them as it will. Theoretically, the legislature could create a system of nonarticle VIII tribunals whose responsibilities would include ruling on pretrial motions, conducting jury trials, recommending sentences, and so forth, as long as the legislature reserves for article VIII judges the ultimate task of signing the final order. In effect, the majority has reduced the "judicial power of the state of Utah" to little more than a ministerial function.

ed in 1896: first in 1944 and again in 1985. From 1896 to 1944, the only language bearing on judicial selection or retention read as follows: "Every judge of the Supreme Court shall be at least thirty years of age, and, before his election, shall be a member of the bar, learned in the law, and a resident of the Territory or State of Utah for five years next preceding his election." Utah Const. art. VIII, § 3 (1896). In 1944, the constitution was amended to include the following reference to the selection of Utah judges:

> Judges of the supreme court and district courts shall be selected for such terms and in such manner as shall be provided by law, provided, however, that selection shall be based solely upon consideration of fitness for office without regard to any partisan political considerations and free from influence of any person whomsoever....

Utah Const. art. VIII, § 3 (1945). Article VIII's current language on judicial selection and retention was adopted in 1985. It is clear, however, that from 1896 to 1985, the constitution never dealt with any specific method of judicial selection or retention. Because the judicial selection and retention provisions serve as the sole basis for the majority's "sacred vessel" theory, this theory could only have been incorporated into the constitution with the 1985 amendments. We therefore turn to the history of the 1985 amendments.

During the tenure of Governor Scott M. Matheson (1977–1985), the legislature made significant revisions to the statutory scheme for judicial selection and retention. These revisions were in turn challenged by Governor Matheson on separation of powers grounds. *See Matheson v. Ferry,* 641 P.2d 674 (Utah 1982) (*"Matheson I"*); *Matheson v. Ferry,* 657 P.2d 240 (Utah 1982) (per curiam) (*"Matheson II"*). Because the outcome of these cases was unfavorable to the legislature's position, pressure arose to amend the constitution to authorize the specific feature of judicial selection (senatorial confirmation of gubernatorial appointments) favored by the legislature. Utah Constitutional Revision Comm'n, Report of the Constitutional Revision Comm'n Submitted to the Governor and 45th Legis. of the State of Utah 15–17, 31–33 (2d prtg. 1984). In response to that pressure, the Constitutional Revision Commission ("CRC") recommended the current language on judicial selection and retention. *Id.* This language was ultimately placed on the ballot as Proposition No. 3 in 1984. *Id. See generally* Minutes of Constitutional Revision Comm'n (May 25–26, 1984). A thorough review of all the relevant minutes and committee reports of the CRC, the legislative floor debates on the judicial article revision, and the voter information supplied in connection with Proposition No. 3 reveals no discussion, reference, or even suggestion that the inclusion of these provisions in the constitution was in any way intended to alter article VIII, section 1's mandate that judicial power be vested in the courts. It is perfectly clear, in fact, that the sole motivation for constitutionalizing the judicial selection and retention process was to insulate the practice of senatorial confirmation from constitutional attack on the basis of the separation of powers doctrine.

Thus, the majority's ipse dixit conclusion that the presence in article VIII of specific methods for judicial selection and retention automatically means that such methods are somehow an integral component of the judicial power is without textual or historical support.

### C. Powers of Judges of Nonrecord Courts and Pro Tempore Judges in Record Courts

The conclusion noted in the preceding paragraph is buttressed by the fact that the constitution itself contemplates that persons not subject to the selection and retention process of article VIII, sections 8 and 9 may nonetheless exercise the judicial power of the state of Utah, including the power to convict of criminal acts and impose criminal penalties. *See* Utah Const. art. VIII, § 1 (legislature may establish nonrecord courts), § 4 (establishing judges pro tempore); Utah Code Ann. §§ 78-5-104 to -106 (1992 & Supp.1993) (establishing criminal jurisdiction of justice courts). Both the majority opinion and Justice Howe's concurrence conclude that the specific constitutional provisions for courts not of record and for the use of pro

tempore judges reflect an intention to permit those individuals to exercise the judicial power, despite the fact that they are exempt from the otherwise mandatory selection and retention processes. There is no textual or historical support for this argument. Indeed, this theory illogically renders the constitution inherently inconsistent. It makes no sense to read the constitutional language as intended to limit the legitimate exercise of the judicial power solely to persons selected by a precise method and simultaneously to maintain that the constitution itself permits the broad exercise of such powers by an unknown and undescribed set of persons, subject to no such selection and retention restrictions. If the constitution defines and restricts the nature of the judicial power by virtue of its selection and retention language, why should it simultaneously contemplate the exercise of the judicial power by nonconstitutional officers, which it clearly does? It is far more logical and historically consistent to view the selection and retention provisions as parallel to, but not a definitional part of, the constitutional role of judges of courts of record. Under this approach, the authorization to the legislature to create nonrecord courts and the broad provisions permitting the use of pro tempore judges in all courts raise no unanswerable questions about the legitimacy of the judicial power.

In his concurring opinion, Justice Howe contends that by expressly authorizing judges pro tempore to perform judicial duties, the constitution implicitly restricts others from performing similar tasks. This court rejected an analogous inference in two early cases. The original language of article VIII provided that judges of the supreme court and the district courts and justices of the peace were "conservators of the peace" and could conduct preliminary hearings in "cases of felony." Utah Const. art. VIII, § 21 (1896). This court held that the grant of power was not exhaustive and did not prevent the legislature from authorizing judges named in the section to hold preliminary hearings in cases involving crimes less serious than felonies. *State v. McIntyre*, 92

Utah 177, 182–85, 66 P.2d 879, 881–82 (1937). More significantly, the court earlier held that the power to hold preliminary hearings did not lie exclusively with the persons named in the section and that the legislature had the power to give city courts the same authority. *State v. Shockley*, 29 Utah 25, 32–35, 80 P. 865, 867–68 (1905).

> It is conceded that by virtue of said section 1, Constitution, the Legislature had authority to create the city court, but it is contended that the foregoing provision of the statute, so far as it attempts to confer jurisdiction upon the judge of said court to sit as a committing magistrate, is in conflict with said section 21 of the Constitution. Counsel for appellant insists that the word "may" in section 21 should be construed to mean "shall," and, when so construed, the doctrine of *expressio unius est exclusio alterius* applies, which, they claim, limits the jurisdiction to hold preliminary examinations to cases of felony exclusively to the officers mentioned in said section. By a careful reading of this section of the Constitution it at once becomes apparent that such could not have been the intention of the framers of that instrument.

*Id.* at 32–33, 80 P. at 867. It seems equally apparent to us that the framers of the judicial selection and retention provisions of the constitution did not intend to limit statutory authorization of the performance of judicial duties exclusively to persons so selected, so long as the fundamental requirements of separation of powers are maintained.

## II. CONSTITUTIONALITY OF UTAH'S COMMISSIONER SYSTEM

Having demonstrated that there is no textual, logical, or historical support for the conclusion the majority forces upon this case, we proceed to analyze the challenge to the commissioners' power as we think an orthodox approach to legal issues demands. Ohms' challenge in this case is to section 78–3–31(6)(a), which empowers commissioners, upon the consent of the defendant, to preside over misdemeanor trials, impose sentence, and enter final judgments of conviction.[6]

---

**6.** Utah Code Ann. § 78–3–31(6)(a) provides as follows:

The court commissioner may accept pleas of guilty or no contest, impose sentence, and en-

Ohms claims, and the majority agrees, that section 78–3–31(6) "is unconstitutional insofar as it delegates ultimate judicial power to court commissioners in violation of article VIII of the Utah Constitution." Maj. Op. at 846. Because a trial before a commissioner may be held only with a defendant's consent and because section 78–3–31(6) does not impinge on the essential powers and independence of the judiciary, we conclude that section 78–3–31(6) does not violate article VIII, section 1.

Ohms' attack on section 78–3–31(6) is strikingly similar to recent attacks on the Federal Magistrate Act of 1979, Pub.L. No. 96–82, 93 Stat. 643 ("FMA"). The FMA grants powers to federal magistrates which, although broader, are analogous to the powers given commissioners under section 78–3–31(6).[7] In a series of cases decided since 1984, litigant after litigant has challenged the FMA on the ground that it violates the mandate contained in the United States Constitution that judicial power be vested in the courts.[8] Federal court after federal court has rejected these challenges and upheld the constitutionality of the FMA.[9]

The seminal federal case in this area is *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).[10] In *Pace-*

ter final judgment in misdemeanor cases. Upon the informed consent of the defendant, the court commissioner may conduct a jury or nonjury misdemeanor trial in accordance with law. Upon conviction, the commissioner may impose sentence and enter final judgment. The judgment entered by the commissioner shall be the final judgment of the court for all purposes, including appeal.

7. Both section 78–3–31(6) and the Federal Magistrate Act ("FMA") allow court adjuncts, upon consent of the defendant, to try criminal misdemeanors, impose sentences, and enter final judgments. *Compare* Utah Code Ann. § 78–3–31(6) *with* 18 U.S.C. § 3401. In addition, the FMA empowers federal magistrates, upon consent of the parties, to adjudicate civil matters and enter final judgments. 28 U.S.C. § 636(c).

8. As does article VIII, section 1 of the Utah Constitution, article III, section 1 of the United States Constitution requires that judicial power be vested in the courts. Article III, section 1 provides:

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

9. The following courts have upheld the authority of federal magistrates to adjudicate civil matters upon consent of the parties: *Goldstein v. Kelleher*, 728 F.2d 32, 36 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Collins v. Foreman*, 729 F.2d 108, 114–15 (2d Cir.), *cert. denied*, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Wharton–Thomas v. United States*, 721 F.2d 922, 929–30 (3d Cir.1983); *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1284–85 (4th Cir.1985); *Puryear v. Ede's*

*Ltd.*, 731 F.2d 1153, 1154 (5th Cir.1984); *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir.1985); *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1045 (7th Cir.1984); *Lehman Bros. Kuhn Loeb, Inc. v. Clark Oil & Ref. Corp.*, 739 F.2d 1313, 1314–16 (8th Cir.1984) (en banc), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 543–46 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Sinclair v. Wainwright*, 814 F.2d 1516, 1519 (11th Cir.1987); *Fields v. Washington Metro. Area Transit Auth.*, 743 F.2d 890, 894–95 (D.C.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.*, 753 F.2d 1029, 1031–32 (Fed.Cir.), *cert. denied*, 474 U.S. 825, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985).

The following courts have upheld the authority of federal magistrates to try criminal misdemeanors upon consent of the defendant: *United States v. Ferguson*, 778 F.2d 1017, 1019 (4th Cir.1985), *cert. denied sub nom. Wilson v. United States*, 476 U.S. 1123, 106 S.Ct. 1990, 90 L.Ed.2d 671 (1986); *United States v. Byers*, 730 F.2d 568, 570 (9th Cir.) (per curiam), *cert. denied*, 469 U.S. 934, 105 S.Ct. 333, 83 L.Ed.2d 270 (1984); *United States v. Dobey*, 751 F.2d 1140, 1143 (10th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985).

10. We note that the analytical model established in *Pacemaker* has subsequently been utilized by courts in analyzing both civil and criminal adjudications by federal magistrates. For instance, in *Byers*, the United States Court of Appeals for the Ninth Circuit was called upon to analyze the constitutionality of 18 U.S.C. § 3401, which permits magistrates to preside over criminal misdemeanor trials with the consent of the parties. In analyzing that statute, the court held that the appellant's "arguments must be evaluated in light of *Pacemaker*." *Byers*, 730 F.2d at 570. The court went on to hold:

*maker,* the United States Court of Appeals for the Ninth Circuit rejected a claim that the FMA violated article III, section 1 of the United States Constitution. *Id.* at 547. The *Pacemaker* court recognized that article III-based challenges to the FMA implicated the doctrine of separation of powers: "Article III is one of the provisions of the Constitution which delineates the separation of powers among the branches of government." *Id.* at 540–41. In this vein, the court observed that

> separation of powers protections ... have two components. One axis reaches to the person affected by government action and encompasses his or her relation to a constitutional branch; the other axis runs from each governmental branch to the others to insure separation and independence in the constitutional structure.

*Id.* at 541; *see also Peretz v. United States,* 501 U.S. 923, 931–32, 936–37, 111 S.Ct. 2661, 2666–67, 2669, 115 L.Ed.2d 808, 819, 822 (1991); *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986). This concept, according to *Pacemaker,* necessitates a two-pronged analysis of statutes such as the FMA. 725 F.2d at 541. Under this two-pronged analytical model, a court should consider (i) whether transfer of a case to an adjunct invades rights personal to the defendant; and (ii) whether, even if the transfer does not invade the defendant's rights, "the existence or operation of the alternate forum compromises the essential independence of the judiciary." *Id.*

> Given the *Pacemaker* majority's emphasis on the curative effects of consent by the parties and control by Article III judges, we cannot, consistent with *Pacemaker,* hold that consensual reference of criminal misdemeanors violates the constitution.
> *Id.; see also Dobey,* 751 F.2d at 1142–43.

11. Justice Russon and the majority claim that "differences between Utah's judicial system and the federal system" mandate a rejection of persuasive federal case law. This assertion is surprising in light of Justice Russon's heavy reliance on earlier federal case law in *Holm. See supra* note 2. In support of its contention that federal case law is not persuasive, the majority asserts that "the Utah judiciary, unlike its federal counterpart, is subject to numerous procedures [including nomination by a nominating commis-

We find much of the *Pacemaker* analysis useful and, unlike the majority, are unwilling to blithely dismiss the accumulated wisdom of a judicial system which has struggled with this issue for over ten years.[11] First, the language of the federal and state constitutions is similar. Both are couched in terms of the vesting of "judicial power" in "courts." *Compare* U.S. Const. art. III, § 1 *with* Utah Const. art. VIII, § 1. Second, both constitutions share a conceptual grounding in the separation of powers doctrine that is an essential part of our common constitutional heritage. *Compare Buckley v. Valeo,* 424 U.S. 1, 120–21, 96 S.Ct. 612, 682–83, 46 L.Ed.2d 659 (1976) *with Timpanogos,* 690 P.2d at 565. Third, the federal magistrate system and the Utah commissioner system are analogous, and the legal challenges to each have been raised in similar contexts. *Compare* 18 U.S.C. § 3401 *and* 28 U.S.C. § 636(c) *with* Utah Code Ann. § 78-3-31(6). *See also* Judicial Council, Court Comm'rs in the Utah State Court System, Report to the Ad Hoc Comm. on Court Comm'rs 3 (June 14, 1993) (noting that Utah's system is modeled after federal magistrate system and that federal system has withstood constitutional challenge). For these reasons, we conclude that *Pacemaker* provides a sound analytical model to use in determining whether the commissioner's actions before us violated article VIII, section 1.

The first question is whether the transfer of this case to a court commissioner invaded rights personal to defendant. We recognize that as a general principle, criminal defen-

sion, retention elections, and review by the judicial conduct commission]." Maj.Op. at 852. As indicated above, however, the framers never intended that the judicial selection, retention, and review provisions convert individual judges into "sacred vessels." Instead, as we have detailed, those provisions were added to the constitution in an effort to settle a dispute between the executive and legislative branches over judicial selection. The majority's reliance on the judicial selection and retention provisions in an effort to distinguish persuasive federal case law is simply misplaced. The majority lists several other differences between the FMA and section 78-3-31. It makes no effort, however, to explain why these superficial differences are significant and, more important, why they dictate the wholesale rejection of a large body of persuasive federal case law.

dants are entitled to have a judge of an article VIII court preside over their trials, impose sentence, and enter final judgments of conviction.[12]  Thus, if section 78–3–31(6) were to *mandate* that certain classes of offenses be tried before a commissioner rather than a judge of an article VIII court, we would be obliged to find it unconstitutional as a legislative interference with the judicial power vested by the Utah Constitution in article VIII courts.[13]  *See Pacemaker*, 725 F.2d at 542.  That is not, however, the case before us.

A defendant's right to have an article VIII judge conduct his trial is a personal right, and as such, it is subject to waiver.  *See Peretz*, 501 U.S. at 931–32, 936–37, 111 S.Ct. at 2666–67, 2669, 115 L.Ed.2d at 819, 822; *Schor*, 478 U.S. at 848–49, 106 S.Ct. at 3255–56; *United States v. Ferguson*, 778 F.2d 1017, 1019 (4th Cir.1985), *cert. denied sub nom. Wilson v. United States*, 476 U.S. 1123, 106 S.Ct. 1990, 90 L.Ed.2d 671 (1986); *United States v. Dobey*, 751 F.2d 1140, 1143 (10th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985); *Goldstein v. Kelleher*, 728 F.2d 32, 35 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Pacemaker*, 725 F.2d at 541.  Given that we allow criminal defendants to waive virtually every other constitutional right, we find it peculiar that the majority opinion does not even analyze whether criminal defendants may waive the right to be tried by an

article VIII judge.  By ignoring this issue, the majority attempts to hide yet another flaw in its reasoning.

That a criminal defendant can waive a personal right and not thereby compromise the fundamental fairness of the judicial proceeding is not a novel concept.  As the Supreme Court pointed out in *Peretz*:

> We have previously held that litigants may waive their personal right to have an Article III judge preside over a civil trial.  *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 92 L.Ed.2d 675, 106 S.Ct. 3245 [3255] (1986).  The most basic rights of criminal defendants are similarly subject to waiver.  *See, e.g., United States v. Gagnon*, 470 U.S. 522, 528, 84 L.Ed.2d 486, 105 S.Ct. 1482 [1485] (1985) (absence of objection constitutes waiver of right to be present at all stages of criminal trial); *Levine v. United States*, 362 U.S. 610, 619, 4 L.Ed.2d 989, 80 S.Ct. 1038 [1044] (1960) (failure to object to closing of courtroom is waiver of right to public trial); *Segurola v. United States*, 275 U.S. 106, 111, 72 L.Ed. 186, 48 S.Ct. 77 [79] (1927) (failure to object constitutes waiver of Fourth Amendment right against unlawful search and seizure); *United States v. Figueroa*, 818 F.2d 1020, 1025 (1st Cir.1987) (failure to object results in forfeiture of claim of unlawful postarrest delay); *United States v. Bascaro*, 742 F.2d

---

12. *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (holding that one purpose of separation of powers doctrine is to safeguard litigant's right to have claim decided before judge "'free from potential domination by other branches of government'" (citations omitted)); *Pacemaker*, 725 F.2d at 541 ("[W]e recognize the principle that parties to a case or controversy in a federal forum are entitled to have the cause determined by Article III judges...."); *Ferguson*, 778 F.2d at 1019 (implicitly recognizing right of criminal defendants to be tried and sentenced before Article III judge); *Dobey*, 751 F.2d at 1142–43 (same); *Byers*, 730 F.2d at 570 (same).

13. Article VIII mandates the creation of a supreme court and a district court of general jurisdiction.  It also grants the legislature broad discretion in creating and defining additional courts.  Utah Const. art. VIII, § 1.  These legislatively created courts are article VIII courts,

whether they be courts of record or courts not of record.  The judicial officers that preside over these courts are article VIII judges if they are selected and retained in office in the manner set forth in article VIII.  Court commissioners sit as adjuncts of and render decisions as district and circuit courts, which are courts of record.  Utah Code Ann. § 78–3–31(6).  Therefore, commissioners qualify for article VIII status only if they are selected and retained pursuant to the provisions governing courts of record: (i) nomination by the appropriate nominating commission, appointment by the governor, and confirmation by the senate; (ii) life tenure subject to retention election or discipline by the judicial conduct commission; and (iii) undiminished salary during tenure in office.  Utah Const. art. VIII, §§ 8, 9, 13, 14.  Commissioners are hired by the judicial council and serve a four-year term subject to removal by the judicial council or judges in the district in which they serve.  *See* Utah R.Jud.Admin. 3–201.  Thus, commissioners are not article VIII judges.

1335, 1365 (11th Cir.1984) (absence of objection is waiver of double jeopardy defense), *cert. denied sub nom. Hobson v. United States,* 472 U.S. 1017, 87 L.Ed.2d 613, 105 S.Ct. 3476 (1985); *United States v. Coleman,* 707 F.2d 374, 376 (9th Cir.) (failure to object constitutes waiver of Fifth Amendment claim), *cert. denied,* 464 U.S. 854, 78 L.Ed.2d 154, 104 S.Ct. 171 (1983). *See generally Yakus v. United States,* 321 U.S. 414, 444, 88 L.Ed. 834, 64 S.Ct. 660 [677] (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right"). Just as the Constitution affords no protection to a defendant who waives these fundamental rights, so it gives no assistance to a defendant who fails to demand the presence of an Article III judge at the selection of his jury.

501 U.S. at 936–37, 111 S.Ct. at 2669, 115 L.Ed.2d at 822; *see also Pacemaker,* 725 F.2d at 543; *State v. Archuleta,* 850 P.2d 1232, 1238–40 (Utah) (recognizing that defendant may waive *Miranda* rights), *cert. denied,* —— U.S. ——, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993). In the instant case, defendant waived his right to be tried before an article VIII judge when he, while represented by counsel, voluntarily consented to trial before a court commissioner. Because section 78–3–31(6) provides for trial before a commissioner only upon the "informed consent" of the defendant and because Ohms does not contend that his waiver does not meet this standard, the first prong of the *Pacemaker* analysis is satisfied.

In an effort to overcome the conclusion that the right to be tried before an article VIII judge is subject to waiver, Ohms tries to recast the issue as one of subject matter jurisdiction. He argues that the commissioner had no jurisdiction to hear this case and that such jurisdiction could not be created by consent. We agree with the majority that this is an improper attempt to recharacterize the issue.

When faced with an assertion similar to the one Ohms makes here, the United States Court of Appeals for the Third Circuit recog-

nized that "jurisdiction in the usual sense may not be conferred by consent ... [and] may not be waived by agreement of the parties." *Wharton–Thomas v. United States,* 721 F.2d 922, 926 (3d Cir.1983). The *Wharton–Thomas* court went on, however, to explain:

> In this case ... jurisdiction was given to the district court by Congress, *see* 28 U.S.C. § 1346(b)—the consent of the litigants had no part in that process. The judgment in this Tort Claims Act case is that of the district court, the forum specified by the statute.
>
> *The parties' consent went not to the jurisdiction of the district court as an entity, but to the judicial officer within the court who conducted the trial.*

*Id.* (emphasis added).

Just as Congress granted the federal district court jurisdiction over causes of action arising under the Tort Claims Act, the Utah legislature specifically granted the circuit court jurisdiction over class misdemeanors. Utah Code Ann. § 78–4–5. Ohms' consent to be tried before a commissioner had no part in that process. Furthermore, according to section 78–3–31(6), the commissioner's judgment was that of the circuit court, the forum specified by the jurisdictional statute. In other words, the commissioner presided over Ohms' trial, imposed sentence, and entered final judgment of conviction as an adjunct of the circuit court, the court with specific statutory authority to hear Ohms' case. Thus, as in *Wharton–Thomas,* Ohms' "consent went not to the jurisdiction of the [circuit] court as an entity, but to the judicial officer *within the court* [i.e., the commissioner] who conducted the trial." 721 F.2d at 926 (emphasis added); *see also Gordy v. State,* 262 Ind. 275, 315 N.E.2d 362, 366–67 (1974) ("We agree that subject matter jurisdiction may be raised for the first time on appeal. However, the qualifications of a judge and his authority to act in a given case are not determinative of subject matter jurisdiction. We look instead to the court in which the matter was tried to determine if there is subject matter jurisdiction." (citations omitted)); *State ex rel. Smith v. Starke Circuit Court,* 275 Ind. 483, 417 N.E.2d 1115, 1123–24 (1981) (same).

Having concluded that Ohms' consent waived any claim he had of invasion of a personal right, we move to the second prong of the *Pacemaker* analysis: whether section 78–3–31(6) "compromises the essential independence of the judiciary." *Pacemaker*, 725 F.2d at 541.

The separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence. *Buckley*, 424 U.S. at 120, 96 S.Ct. at 682–83; *accord Timpanogos*, 690 P.2d at 564–65; *Matheson I*, 641 P.2d at 676; *id.* at 681–82 (Howe, J., concurring).[14] Accordingly, we note at the outset, "The component of the separation of powers rule that protects the integrity of the constitutional structure, as distinct from the component that protects the rights of the litigants, cannot be waived by the parties." *Pacemaker*, 725 F.2d at 543–44. Such a result is necessary because this prong of the separation of powers doctrine serves to protect "institutional interests that the parties cannot be expected to protect." *Schor*, 478 U.S. at 850–51, 106 S.Ct. at 3256–57; *cf. Timpanogos*, 690 P.2d at 564–65 (discussing importance of independent judicial institution); *Matheson I*, 641 P.2d at 681–82 (Howe, J., concurring) (same).

Any attempt to place the exercise of the judicial power outside the control of the judiciary threatens "the fundamental integrity of the judicial branch." *In re Criminal Investigation, 7th Dist. Ct. CS–1*, 754 P.2d 633, 642 (Utah 1988). Thus, if we were to conclude that section 78–3–31(6) represents an attempt by the legislature or executive branch to encroach on the judiciary's constitutionally mandated role, we would be obliged to strike it down. Utah Const. art. V, § 1; *Timpanogos*, 690 P.2d at 564–65; *Matheson I*, 641 P.2d at 681–82 (Howe, J., concurring); *Rampton v. Barlow*, 23 Utah 2d 383, 464 P.2d 378, 382–83 (1970). The statute before us, however, has no such infirmity.

Section 78–3–31(6) contains sufficient protections against the erosion of judicial power to overcome the cursory separation of powers objections raised by the majority. Section 78–3–31(6) invests judges of article VIII courts with extensive and exclusive control over the composition, management, and operation of the commissioner system. As a primary and necessary incident of this control, we recognize that the power to appoint and remove court commissioners is vested entirely in the judicial branch. Utah Code Ann. § 78–3–31(2)(a), (8)(a); Utah R.Jud.Admin. 3–201(3), (6). By retaining control over both the selection and the retention of commissioners, the judicial branch insulates commissioners from undue influence by members of other branches of government. *See Collins v. Foreman*, 729 F.2d 108, 115 (2d Cir.), *cert. denied*, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Wharton–Thomas*, 721 F.2d at 927. In addition to appointment and removal powers, section 78–3–31 charges the presiding judge in the district in which the commissioner primarily serves with the "day-to-day supervision" of the commissioner. Utah Code Ann. § 78–3–31(7)(b). This broadly framed language allows the judiciary considerable flexibility in designing the specific means by which it will supervise its commissioners. Finally, section 78–3–31 empowers the judicial council to establish "rules defining the duties and authority of court commissioners for each level of court they serve." *Id.* § 78–3–31(9). Because the judiciary retains ultimate and exclusive control over the administration of the commissioner system, we conclude that section 78–3–31(6) does not violate the Utah Constitution. *See In re Criminal Investigation*, 754 P.2d at 642 ("As long as the district court retains ultimate precompliance control over the enforcement of a subpoena issued pursuant to the [Subpoena Powers] Act, the judicial function is not delegated unconstitutionally to the executive branch.").

---

14. Unlike the United States Constitution, the Utah Constitution contains a specific provision mandating separation of powers. Article V, section 1 of the Utah Constitution provides:

The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

In addition to the extensive administrative control over the commissioner system vested in the judiciary, article VIII courts retain full authority over questions of law through the availability of appellate review. In arguing that section 78–3–31(6) is unconstitutional, Ohms asserts that no court has appellate jurisdiction to the review a commissioner's entry of final judgment. This claim is wholly without merit. Section 78–3–31(6) specifically provides, "The judgment entered by the commissioner shall be the final judgment of the court for all purposes, including appeal." Utah Code Ann. § 78–3–31(6)(a). As this provision makes clear, when a commissioner is acting as an adjunct of the circuit court, any final order of that commissioner is a final order of the circuit court. Accordingly, the court of appeals would have jurisdiction pursuant to section 78–2a–3(2)(d). Thus, article VIII judges retain control over the "interpretation, declaration, and application" of Utah law. *See Pacemaker*, 725 F.2d at 544.

The extensive administrative control exercised by article VIII judges, when coupled with the availability of appellate review by article VIII judges of all commissioners' decisions, leads us to conclude that section 78–3–31(6) does not compromise the essential independence of the judiciary. Because both prongs of the *Pacemaker* analytical model are met, we would hold that section 76–3–31(6) does not violate the Utah Constitution.

Furthermore, Utah's history and practice regarding the use of court commissioners demonstrate no abuses that would threaten the independence of the judiciary on the one hand or its accountability on the other. The requirement of consent from a criminal defendant before a commissioner can hear misdemeanor cases ensures due process, as does the availability of appellate review on the merits of the decision. The majority opinion posits potential "horribles," such as legislative authorization for commissioners to adjudicate capital cases. It is difficult to envision the political atmosphere in which the Utah legislature would so act or the Utah judicial council (which is responsible for rules governing the use of commissioners) would approve, but in any event, such an abuse would be reviewable on numerous constitutional grounds. The statute before us, by contrast, merely empowers commissioners, subject to the procedures authorized by the judicial council, to hear misdemeanor offenses with the *consent* of the defendant. That statute is constitutional.

Finally, we note that the legislature has long regarded the use of court commissioners as constitutional. In 1965, the legislature passed the Juvenile Court Bill, which authorized juvenile court commissioners. *See* ch. 165, § 13, 1965 Utah Laws 595, 602. In 1969, the Family Court Act authorized court commissioners to perform counseling, reconciliation, and other services. *See* ch. 72, § 15, 1969 Utah Laws 327, 332. The authority of the district court to appoint commissioners to conduct civil mental commitment proceedings has existed at least since 1951, *see* ch. 113, § 3, 1951 Utah Laws 366, 374, and has been exercised continuously since 1974. *See* Judicial Council, Court Comm'rs in the Utah State Court System: Report to the Ad Hoc Comm. on Court Comm'rs 1 (June 14, 1993). In 1985, the legislature expanded the authority of commissioners in domestic relations cases. *See* ch. 151, §§ 1– 5, 1985 Utah Laws 266, 266–67. Five years later, in 1990, the legislature repealed most of the existing statutory grants of authority and directed the judicial council to adopt rules governing the authority of court commissioners. *See* ch. 230, §§ 2, 4, 1990 Utah Laws 1111, 1111–13. Finally, in 1991, the legislature extended the authority of commissioners to include most criminal magistrate functions and the adjudication of class A misdemeanors (and below) with the consent of the defendant. *See* ch. 268, § 29, 1991 Utah Laws 1070, 1086–87.

The history of legislative authorization for and use by the courts of commissioners demonstrates two truths: (i) Use of commissioners is a successful method for dealing with certain kinds of demands on the resources of the courts; and (ii) neither the legislature nor the courts themselves have ever perceived in such use an unconstitutional delegation of the judicial power vested by the constitution in the courts or a violation of the separation of powers doctrine.

## III. CONCLUSION

Today, in a broadly worded opinion, the majority incorporates into the Utah Constitution the grandiose notion of the person of the judge as a "sacred vessel." In so doing, the majority places severe restrictions on the ability of the judicial branch to manage litigation in Utah. In an opinion that summarily dismisses persuasive federal case law and fails to conduct even a cursory analysis of the text or history of article VIII, the majority concludes that article VIII's selection and retention provisions operate as a limit on those who may exercise the judicial power of the state of Utah. The majority reaches this result even though the statute in question preserves the essential independence and integrity of the judiciary by placing Utah's commissioner system under the exclusive control of the judiciary. The majority opinion is neither constitutionally required nor analytically sound, and we anticipate that constitutional revisions may be necessary to alleviate the mischief it does.[15] In any event, today's decision will require pervasive changes in the way Utah's judiciary does business, changes that for all the majority's concerns over the status of the decision maker will be largely of form and not substance.

---

15. The majority engages in a lengthy analysis of whether prior actions of commissioners are valid under the doctrine of de facto authority. Although we find it unnecessary to conduct such an analysis given our determination that section 78–3–31(6) is constitutional, we agree with the majority's conclusion, though not its rationale, that prior actions of commissioners are valid. We are puzzled, however, by the majority's further conclusion that it would be "unconscionable" to uphold Ohms' conviction. According to the majority's analysis, the commissioner in this case had de facto authority and Ohms' conviction should therefore be upheld. Indeed, this is the result reached by the Indiana Supreme Court in *Smith*, a case upon which the majority heavily relies. *State ex rel. Smith v. Starke Circuit Court*, 275 Ind. 483, 417 N.E.2d 1115, 1124 (1981) (invalidating master commissioner system but upholding commissioner's decision based on de facto authority doctrine).