908 P.2d 345 (1995)
STATE of Utah, in the INTEREST of R.N.J., fka R.N.P., a person under eighteen years of age.
T.B., Respondent and Appellant,
v.
M.M.J., Petitioner and Appellee.
No. 950266-CA.
Court of Appeals of Utah.
November 22, 1995.
*346 Gary W. Pendleton, St. George, for Appellant.
Glen D. Watkins and Bruce Wycoff, Salt Lake City, for Appellee.
G. Michael Westfall, St. George, Guardian ad Litem for R.N.J.
Before ORME, BILLINGS, and WILKINS, JJ.
WILKINS, Judge:
T.B., the mother of R.N.J., appeals the juvenile court's order that granted the petition of M.M.J., the adoptive father of R.N.J., to voluntarily terminate his parental rights to R.N.J.

BACKGROUND
R.N.J.'s mother met the adoptive father in November 1987. At that time, R.N.J., who was the legal daughter of both her biological parents, was living with her mother but not with her biological father. The following year, in December 1988, the mother divorced R.N.J.'s biological father. A few days after the divorce, she married the adoptive father. R.N.J. was four years old at the time of this marriage. R.N.J., her mother, and the adoptive father subsequently lived together as a family.
More than four years later, in March 1993, the adoptive father and the mother filed a petition for the adoptive father to adopt R.N.J. The court entered a Decree of Adoption in April 1993, after the parental rights of R.N.J.'s biological father were terminated. Thereafter, the adoptive father became R.N.J.'s legal father, possessing all the rights and duties of a legal parent.
In June 1993, after the mother had moved to California with R.N.J. and the couple's other child, the mother sued the adoptive father for separation in a California court. Within a few weeks, the adoptive father sued the mother for divorce in a Utah court. The Utah action was dismissed, and the parties stipulated that jurisdiction of the divorce proceedings would be vested in a specified court in California. That court took jurisdiction of the divorce proceedings, including issues of child custody, support, and visitation. The California court entered a judgment granting the divorce in September 1994. The judgment gave the mother custody of R.N.J., did not grant the adoptive father any visitation rights, in accordance with his own request, and ordered the adoptive father to pay child support.
In October 1993, the adoptive father filed a petition in Utah to annul R.N.J.'s adoption or to terminate his parental rights to R.N.J. In January 1995, the district court dismissed with prejudice the adoptive father's claim for annulment, and the parties agreed to proceed to trial exclusively on the adoptive father's claim for voluntary termination of his parental rights. The district court judge ordered the case transferred to the juvenile court. The juvenile court judge simultaneously appointed the district court judge to handle the case as a juvenile court judge, and that same day the case was tried.
*347 After trial, the court found "only by the barest preponderance of the evidence" that it was in R.N.J.'s best interest to terminate the adoptive father's parental rights and obligations. The court filed its order in March 1995. Thereafter, the mother filed this appeal.

ANALYSIS
On appeal, the mother questions the jurisdiction of the juvenile court to consider the matter under the Utah Uniform Child Custody Jurisdiction Act (Utah UCCJA), and whether the trial court should have applied a clear and convincing standard of proof rather than a preponderance of the evidence standard in the termination proceeding.

I. Jurisdiction
We first resolve two jurisdictional issues regarding this case. First, we raise, sua sponte, the issue of whether the district court judge's appointment as a juvenile court judge pro tern was valid. Although we conclude that the appointment was invalid, we also conclude that under the de facto officials doctrine the district court judge's actions while acting as a juvenile court judge are valid as to the parties and the public. Second, we conclude that the trial court had subject matter jurisdiction because this proceeding was not a "child custody proceeding" under the UCCJA.

A. Appointment of District Court Judge as Juvenile Court Judge
We first address whether the trial judge's appointment as a juvenile court judge was valid, an issue we raise sua sponte. Generally, "if a [party] has not raised an issue on appeal, we may not consider the issue sua sponte." State v. Rodriguez, 841 P.2d 1228, 1229 (Utah App.1992) (citing State v. Larocco, 794 P.2d 460, 473 (Utah 1990) (plurality opinion)). However, whether the trial judge had authority to hear and render judgment in this case raises a question as to whether the trial court had jurisdiction. If the trial judge was not acting with proper authority as a juvenile court judge, then as a district court judge, he lacked jurisdiction. See Utah Code Ann. § 78-3a-16(2)(f) (Supp. 1995) ("[T]he juvenile court has exclusive original jurisdiction in proceedings ... to terminate the legal parent-child relationship...."). Jurisdictional issues may be raised for the first time on appeal. Jefferies v. Jefferies, 895 P.2d 835, 838 (Utah App. 1995). Therefore, we raise this issue sua sponte even though neither party raised it below or on appeal. Cf. Salt Lake City v. Ohms, 881 P.2d 844, 852-53 & 866-67 (Utah 1994) (agreeing, in majority and dissenting opinions, that because circuit court had authority to decide case, competency of circuit court commissioners to decide case was question of their power and authority, not question of subject matter jurisdiction of circuit court).
According to the Utah Code of Judicial Administration, an active judge may temporarily serve as a judge "of a court with equal or different jurisdiction in the same or a different geographical division" and will enjoy, while serving in that court, "the same powers as a judge of that court." Utah R.Jud.Admin. 3-108(3) (1995). In order to serve in this way, however, the judge must be assigned to the other court either by the presiding officer of the Judicial Council or by the state court administrator with the approval of the Council's presiding officer. Id. The presiding officer of the Judicial Council is the chief justice of the Utah Supreme Court. Utah Const. art. VIII, § 12(2); Utah R.Jud.Admin. 1-101(1)(Q).
This procedure was not followed by the trial court. The district court judge was temporarily appointed to act as a juvenile court judge in this case by an order signed only by the juvenile court judge. The record does not include an appointment by the chief justice of the Utah Supreme Court, or by the state court administrator acting with the approval of the chief justice. Therefore, the trial court judge acted without the legal authority of a juvenile court judge when he heard and decided this case.
However, the trial judge's judgment is valid as to the parties and the public the same as if he had been properly appointed because his actions in this case fall within the de facto officials doctrine. Under this *348 doctrine, persons who assume official authority under color of a valid appointment and with public acquiescence in the authority are considered de facto officials even though they are technically ineligible for the public office. State v. Menzies, 845 P.2d 220, 226 (Utah 1992). "In the interest of justice, the actions of a de facto official are considered valid as to third persons and the public." Id. But cf. Ohms, 881 P.2d at 854-55 (holding that, although de facto doctrine would validate past actions of commissioners, the actions of the commissioner that petitioner challenged would be deemed invalid to reward petitioner for challenging an unconstitutional statute). Utah courts have relied on this doctrine a number of times to uphold the actions of those acting without proper authority in a public office, including the actions of district court judges sitting on the supreme court and, more recently, the actions of court commissioners filling judicial roles. See, e.g., Ohms, 881 P.2d at 853-54; In re Thompson's Estate, 72 Utah 17, 87, 269 P. 103, 128 (1927).
The landmark definition of de facto officers accepted by the Utah Supreme Court in 1983 includes the situation in this case where a judge acted under color of a known appointment that was void because the appointing body lacked power to appoint the judge. Vance v. Fordham, 671 P.2d 124, 131 n. 5 (Utah 1983). Therefore, although the trial court technically acted without legal authority, we will consider his order valid as between the parties to this action and as to the public.

B. Jurisdiction under the UCCJA
The mother argues that the trial court lacked subject matter jurisdiction to hear this case because the California court that issued the couple's divorce judgment retained jurisdiction of all custody issues under the Utah Uniform Child Custody Jurisdiction Act (Utah UCCJA) (codified at Utah Code Ann. §§ 78-45c-1 to 78-45c-26 (1992 & Supp. 1995)). The mother bases her argument on the premise that the voluntary termination of the adoptive father's parental rights in, and obligations to, R.N.J. is a custody issue under the Utah UCCJA. We disagree.
Rather, we conclude that a proceeding involving the termination of a parent's rights and obligations is not a custody proceeding under the Utah UCCJA. This conclusion is supported by Utah's statutory scheme. A "custody determination" is defined in the Act as "a court decision and court orders and instructions providing for the custody of a child, including visitation rights; it does not include a decision relating to child support or any other monetary obligation of any person." Utah Code Ann. § 78-45c-2(2) (1992). A "custody proceeding" under the Utah UCCJA, "includes proceedings in which a custody determination is one of several issues, such as an action for dissolution of marriage." Id. § 78-45c-2(3). Therefore, although these definitions make clear that the California case involving the dissolution of the parties' marriage and the custody of R.N.J. was a custody proceeding under the Utah UCCJA, these definitions do not clarify whether this proceeding involving the termination of the adoptive father's rights and obligations also was a custody proceeding.
Other provisions of the Utah Code, however, lead to the conclusion that a termination proceeding is not a custody proceeding. The Juvenile Courts Act specifically separates termination of parental rights proceedings and custody proceedings. Juvenile courts are granted exclusive original jurisdiction in cases involving the termination of a parent's rights, with a limited exception not relevant here. See Utah Code Ann. § 78-3a-16(2)(f) (Supp.1995); id. § 78-30-4.16(1)(b). District courts, however, have original jurisdiction over cases involving "questions of custody," and the juvenile court may only hear custody cases if they have first been certified by the district court. Id. § 78-3a-16(3); see also id. § 78-3a-17(4).
In addition, our conclusion is consistent with the general principle "that when two statutory provisions conflict, the more specific provision will prevail over the more general provision." Williams v. Public Serv. Comm'n, 754 P.2d 41, 48 (Utah 1988). The Termination of Parental Rights Act (TPR Act) specifically "provides a judicial process for voluntary and involuntary severance of *349 the parent-child relationship." Utah Code Ann. § 78-3a-402(1) (Supp.1995). Utah's TPR Act, taken in conjunction with section 78-3a-16(2)(f) of the Utah Code, which grants exclusive original jurisdiction to juvenile courts in termination proceedings, provides a specific statutory framework to follow in termination proceedings. These specific statutory provisions prevail over the more general provisions of the Utah UCCJA, which makes no specific reference to termination proceedings.
Our conclusion is also supported by the principle that "`the later expression of the legislature'" controls when statutes conflict or overlap in their treatment of the same subject matter. Murray City v. Hall, 663 P.2d 1314, 1318 (Utah 1983) (quoting 2A C. Sands, Sutherland Statutory Construction, § 51.02 at 290 (4th ed. 1973)). The Utah Legislature enacted the Utah UCCJA in 1980. See Law of Feb. 1, 1980, ch. 41, 1980 Utah Laws 290. The legislature enacted the TPR Act twelve years later in 1992. See Law of Feb. 26, 1992, ch. 221, 1992 Utah Laws 826. Therefore, to the degree that conflict or overlap may exist between the two acts, the Utah TPR Act supersedes the Utah UCCJA.
Following this statutory scheme, Utah's appellate courts also have kept separate the concepts of "child custody" and "termination of parental rights." See, e.g., Sanderson v. Tryon, 739 P.2d 623, 627 (Utah 1987) (noting that "the standard governing actions for termination of parental rights is not applicable to child custody disputes"); State ex rel. J.J.T., 877 P.2d 161, 165 & nn. 4 & 5 (Utah App.1994) (distinguishing between depriving parent of custody of child and terminating parent's rights); State ex rel. D.M., 790 P.2d 562, 567-68 & nn. 2 & 3 (Utah App.1990) (distinguishing between legal custody orders and termination of parental rights and the requirements for each); In re N.H.B., 769 P.2d 844, 851 (Utah App.1989) (listing terms "child custody" and "termination of parental rights" separately in discussion of juvenile court jurisdiction).
The mother cites cases from other states to support her argument that we should find that a case involving the termination of a parent's rights is a child custody proceeding under the Utah UCCJA. See In re David C., 152 Cal.App.3d 1189, 200 Cal.Rptr. 115 (1984); In re A.E.H., 161 Wis.2d 277, 468 N.W.2d 190, cert. denied, 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991). We are not persuaded by these cases because they are based on statutory schemes different from that scheme adopted in Utah.
We conclude that the provisions of the Utah UCCJA do not apply to a case such as this that involves the termination of parental rights and obligations.

II. Standard of Proof
The mother also argues that the trial court erred by applying a preponderance of evidence standard rather than requiring proof by clear and convincing evidence.[1] Whether the trial court applied the wrong standard of proof is a question of law hinging on an interpretation of section 78-3a-406(3) of the Utah Code and Rule 41 of the Utah Rules of Juvenile Procedure. "We review questions of statutory interpretation for correctness giving no deference to the trial court's interpretation." Wells v. Wells, 871 P.2d 1036, 1038 (Utah App.1994).
The adoptive father argues that the mother is barred from raising the issue for the first time on appeal. Under almost all circumstances, "matters not raised in the pleadings nor put in issue at the trial may not be raised for the first time on appeal." James v. Preston, 746 P.2d 799, 801 (Utah App.1987).
*350 The policy behind requiring an appellant to first raise an issue in the trial court is one of judicial economy and orderly procedure. See Clegg v. Lee, 30 Utah 2d 242, 516 P.2d 348, 353 (1973) (stating "[o]rderly procedure requires that a party must present his entire case and his theory or theories to the trial court, and he cannot thereafter urge a different theory"); Simpson v. General Motors Corp., 24 Utah 2d 301, 470 P.2d 399, 401 (1970) (concluding that the court would not consider issues raised for the first time on appeal because it would run contrary to "[o]rderly procedure"). The underlying considerations of this policy involve allowing the trial court the opportunity to consider, and perhaps correct, an error claimed by the appellant. See Utah County v. Brown, 672 P.2d 83, 85 (Utah 1983). This is particularly true in circumstances where factual determinations are central to the claimed error. See James, 746 P.2d at 801.
However, in this case, the issue of whether the trial court applied the wrong standard of proof is not an issue that "`depends on controverted factual questions whose relevance thereto was not made to appear at trial.'" James, 746 P.2d at 801 (quoting Bogacki v. Board of Supervisors, 5 Cal.3d 771, 97 Cal. Rptr. 657, 663-64, 489 P.2d 537, 543-44 (1971), cert. denied, 405 U.S. 1030, 92 S.Ct. 1301, 31 L.Ed.2d 488 (1972)). Neither is this a question that we would "derive great benefit from the trial judge's views on the issue and may be persuaded by those views." Zions First Nat'l Bank v. National Am. Title Ins. Co., 749 P.2d 651, 654 (Utah 1988). Instead, the trial court clearly stated and applied the disputed standard of proof in reaching its legal ruling. As such, this is a legal question that is easily answered from reading the statute. Therefore, many of the policy reasons behind the general rule that an issue may not be raised for the first time on appeal do not apply in this case.
Furthermore, although this general rule applies in almost all cases, clearly defined exceptions to the general rule exist. One such exception we have already addressed: Issues regarding the jurisdiction of the trial court, or of this court, to hear the matter may be raised for the first time on appeal. Jefferies v. Jefferies, 895 P.2d 835, 838 (Utah App.1995).
Other exceptions to this blanket proscription involve instances of plain error or exceptional circumstances. See State v. Archambeau, 820 P.2d 920, 925-26 (Utah App.1991). This court has held that the appellant must argue plain error or exceptional circumstances to the appellate court for us to consider the appealed issue under the plain error or exceptional circumstances analysis. See State v. Jennings, 875 P.2d 566, 570 (Utah App.1994). The mother has not argued these exceptions on appeal.
Failure to argue plain error or exceptional circumstances is usually fatal to an appellant's claim. Id.; State v. Peterson, 881 P.2d 965, 968 (Utah App.1994), cert. denied, 890 P.2d 1034 (Utah 1995). However, in an extremely narrow set of circumstances, court-made rules and doctrines in furtherance of judicial efficiency and equity must give way when the central issue to be decided concerns the best interests of a child. See, e.g., State ex rel. J.L.W., 900 P.2d 543, 549 (Utah App.1995) ("[I]t is inappropriate to consider application of so-called equitable doctrines or those which promote mere judicial efficiency at the expense of a child's welfare."); Larson v. Larson, 888 P.2d 719, 722 n. 2 (Utah App.1994) ("We have ... trepidation about the applicability of res judicata to `child custody and related proceedings... where the welfare of children is at stake.'" (citation omitted)); State ex rel. J.J.T., 877 P.2d 161, 164 (Utah App.1994) ("[I]t cannot be persuasively argued that judicial economy or the convenience afforded by finality of legal controversies must override the concern for a child's welfare."). This case fits within this narrow exception.
Notably, this case is about the adoptive father's attempts to avoid his legal parental obligations; this case only incidentally concerns his parental rights. The adoptive father has already clearly demonstrated his attitude toward the "rights" of his father-daughter relationship with R.N.J. He waived any claim to visitation with R.N.J. under the divorce decree entered in California. In addition, he filed the petition that gave rise to this case, which sought to undo *351 the adoption of R.N.J. as if from its very inception, or to terminate his parental rights. Therefore, what the adoptive father actually seeks to terminate in this case are his duties as a father to R.N.J., specifically his duty to support her. Thus, in this case we are not dealing with the financial interests of the mother; we are dealing with the financial obligations of the adoptive father to his daughter, R.N.J. It is R.N.J.'s right to parental support that is the centerpiece of the father's voluntary termination of his legal parental duties. The adoptive father seeks to end his legal obligations to support, care for, and love R.N.J. Therefore, in this instance we raise the plain error exception sua sponte as one of the narrow classes of cases involving a judge-made rule intended to promote judicial efficiency that would, if applied, impinge on the best interests of a child.
Two requirements must be met to find plain error. First, the error must be "plain," such that "from our examination of the record, we must be able to say that it should have been obvious to a trial court that it was committing error." State v. Eldredge, 773 P.2d 29, 35 (Utah), cert. denied, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989). Second, the error must be prejudicial to the appellant. Id.
The first requirement is easily met because the juvenile court's error was "plain." "The Court shall in all cases [under the TPR Act] require the petitioner to establish the facts by clear and convincing evidence." Utah Code Ann. § 78-3a-406(3) (Supp.1995). In addition, Rule 41(b) of the Utah Rules of Juvenile Procedure provides that "cases involving the permanent deprivation of parental rights must be proved by clear and convincing evidence." That these provisions control the standard of proof to be applied in this case should have been evident to the trial court.
The second requirement for plain error is also met. The trial court found that R.N.J.'s best interests were served by terminating the adoptive father's parental rights and obligations only "by the barest preponderance of the evidence." Since the preponderance standard was "barely" met, the court could not have found that terminating the adoptive father's rights and obligations would have been in R.N.J.'s best interests by the significantly higher clear and convincing standard. In other words, if the court had applied the correct standard, R.N.J. would not have lost her right to be supported by her father. Use of the wrong standard of proof, which culminated in her loss of that support, clearly prejudiced her.
Only in the most aggravated and difficult cases do the best interests of the child call for the court to relieve a living, capable, and solvent parent of the obligation to support the parent's child. Public policy strongly favors parents bearing the burdens of support for their children, financial and otherwise. See Utah Code Ann. § 78-45-3(1) (Supp.1995) ("Every father shall support his child...."); id. § 78-45-4(1) ("Every woman shall support her child...."); cf. Hills v. Hills, 638 P.2d 516, 517 (Utah 1981) (stating, in a voluntary termination of parental rights case, that "[t]he right to support from the parents belongs to the minor children and is not subject to being bartered away, extinguished, estopped or in any way defeated by the agreement or conduct of the parents"). Courts in other states have held that parents may not voluntarily terminate their parental rights simply to avoid their responsibility to support their children.[2] "Surely the legislature *352 did not intend that [section 78-3a-407(7)] be used as a means for a parent to avoid the obligation to support his or her children." In re Bruce R., 234 Conn. 194, 662 A.2d 107, 117 (1995). Unlike an adoption case, where a parent waives his or her parental rights to a child in order that another may assume those rights and obligations, this is a case where allowing the adoptive father to voluntarily terminate his rights and obligations would leave R.N.J. with only one legal parent.
As is often the situation, the personal and financial dispute between the mother and adoptive father was played out on the battlefield of the child's well-being, and her financial, social, and familial stability. However, it was with just such difficulties in mind that the legislature mandated a greater burden on the parent, adoptive or natural, who seeks to voluntarily relieve himself of the duty to support his child. Clear and convincing proof of the material and relevant facts is mandated. These facts must convince the court "that termination is in the child's best interest." Utah Code Ann. § 78-3a-407(7) (Supp.1995).

CONCLUSION
We conclude that the trial judge was not properly appointed to act as a juvenile court judge, but that his acts are valid and binding as to the parties and the public under the de facto public official doctrine. We further conclude that Utah's TPR Act vests exclusive original jurisdiction in the Utah Juvenile Court to hear the adoptive father's petition to voluntarily terminate his parental relationship with R.N.J., and that the Utah UCCJA does not apply to termination actions.
Having determined that the trial court had adequate jurisdiction to hear and decide the matter, we further conclude that it was plain error for the trial court to apply a standard other than one of clear and convincing proof of the ultimate fact necessary to terminate the parent-child relationship, and we accordingly reverse.
ORME, P.J., and BILLINGS, J., concur.
NOTES
[1] The trial court appointed a Guardian ad Litem to protect the interests of R.N.J. Unfortunately, the Guardian ad Litem, like the mother, failed to raise the issue of the standard of proof at the trial level. The child, and derivatively her mother, were harmed by the error.

Fortunately, our plain error analysis of the claim allows the mother to raise the issue of whether the trial court applied the proper standard of proof for the first time on appeal. Both the mother and the adoptive father addressed the issue in their briefs and on oral argument. Again, unfortunately, the Guardian ad Litem elected not to participate in the appeal on behalf of the child.
[2] See, e.g., Ex parte Brooks, 513 So.2d 614, 616 (Ala.1987) (stating that termination of parental rights statutes not meant to be "means for a parent to avoid his obligation to support his child"), overruled on other grounds by Ex parte Beasley, 564 So.2d 950 (Ala.1990); In re Bruce R., 234 Conn. 194, 662 A.2d 107, 111 & 117 (1995) ("It would be anathema for our law to allow parents to terminate voluntarily their parental rights `solely for the purpose of evading or relieving [themselves] of responsibility to pay child support.' ... [P]arental rights should not be terminated solely to advance the convenience and interests, either emotional or financial, of the parent." (citations omitted)); In re D.W.K., 365 N.W.2d 32, 35 (Iowa 1985) (stating that father's consensual termination petition was denied in best interest of child where termination "ultimately would open a hatch for a parent to escape his or her duty to support a child"); In re K.J.K., 396 N.W.2d 370, 371-72 (Iowa Ct.App. 1986) (holding that granting the father's petition to voluntarily terminate his parental rights was not "in the child's best interest, particularly when considered with the child's right to support from her father"); In re Welfare of Alle, 304 Minn. 254, 230 N.W.2d 574, 577 (1975) (holding that consensual termination petition of adoptive father denied because "[t]he children wish to be able to look to their legal father for financial support; it surely cannot be in their best interests to have that avenue of support terminated"); In re R.A.S., 826 S.W.2d 397, 401 (Mo.Ct.App. 1992) (upholding trial court's denial of consensual termination petition where evidence showed that father sought to avoid his support obligation); R.H. v. M.K., 254 N.J.Super. 480, 603 A.2d 995, 997-98 (1991) (noting, where held that parent may not voluntarily surrender his or her parental rights other than in adoption context, "[a] child's relationship with his or her parents is so significant that all doubts are to be resolved against the destruction of that relationship"); Commonwealth ex rel. Hager v. Woolf, 276 Pa.Super. 433, 419 A.2d 535, 538 (1980) (holding that state statute "was not designed to permit a parent to avoid a support obligation by the mere filing of a petition to terminate parental rights, any more than a parent is permitted to `bargain away' the obligation by any other means"); In re A.B., 151 Wis.2d 312, 444 N.W.2d 415, 419 (1989) ("Parental rights may not be terminated merely to advance the parents' convenience and interests, either emotional or financial.... Simply put, no parent may blithely walk away from his or her parental responsibilities.").