**In re STATE of Utah, in the Interest of J.P., K.D., and K.D., Persons under Eighteen Years of Age.**

**STATE of Utah, Appellant,**

v.

**J.P.S., Appellee.**

**No. 950364–CA.**

Court of Appeals of Utah.

July 11, 1996.

Jan Graham and Carol L.C. Verdoia, Salt Lake City, for Appellant.

Frank G. Smith, Ogden, for Appellee.

Jan Arrington, Layton, Guardian Ad Litem.

Before ORME, BILLINGS, and JACKSON, JJ.

## OPINION

BILLINGS, Judge:

The State of Utah Division of Family Services (DFS) appeals a juvenile court order denying its petition to terminate J.P.S.'s parental rights in her three children. We reverse and remand for a new trial consistent with this opinion.

## FACTS

 "Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail." *State ex rel. C.Y. v. Yates,* 765 P.2d 251, 252 (Utah App.1988).

J.P.S. is the natural mother of J.L.P., born December 1, 1982; K.M.D., born February 21, 1990; and K.A.D., born December 28, 1991. In June 1992, J.P.S. voluntarily placed J.L.P. in DFS custody upon learning that J.L.P., then nine years old, had sexually abused her younger siblings and other neighborhood children. Pursuant to a DFS treatment plan, J.L.P. underwent psychological evaluations and was placed in a proctor home.[1] In August 1992, J.P.S. was admitted to a hospital to guard against suicide and entered into an inpatient substance abuse program. At this time, K.M.D., two-and-a-half years old, and K.A.D., seven months old, were taken into DFS custody pursuant to a dependency petition and placed in a separate foster home from J.L.P.

More than two years later, the State filed a petition to terminate the parental rights of J.P.S. in her three children. A trial was held in juvenile court. The undisputed evidence established that J.P.S. is unfit to have custody of her three children by virtue of her limited intelligence and her severe psychological problems and addictions. Specifically, J.P.S. has a long history of sexual abuse in her own childhood, has struggled with lifelong drug and alcohol abuse, has lacked a parental role model, and has demonstrated serious neglect of her own children. In addition, J.L.P., the oldest child, was sexually abused by family and friends of J.P.S., and the two younger children were sexually abused by J.L.P., all of which occurred while the children were in J.P.S.'s care.

The evidence also established the State has provided numerous services and assisted J.P.S. for over two years to enable her to regain the custody of her children. Most recently, the State provided intensive family preservation services for a period longer than usual in an effort to reunify this family. Thus, the trial court found the State had met its obligation to try to reunify the family.

Based on the foregoing, two evaluators recommended termination of J.P.S.'s parental rights. Philip Johnson, a licensed marriage and family therapist, performed an evaluation of J.P.S. in 1992. He determined she was unfit to parent and noted that J.P.S.'s limited intelligence and severe psychological problems would make it very difficult for her to realize any change. Mr. Johnson recommended the children be placed for adoption because they need permanency. He also asserted that continued visitation between the children and the natural parent can confuse the child and can result in continued negative influences on the child. Moreover, he testified that a sense of "belongingness" is best achieved if the children's fear of any future change is eliminated.

Dr. Craig Swaner, a licensed psychologist, performed a psychological evaluation of J.P.S. in 1993. He concluded J.P.S. has "significant deficits with regard to her functioning in most of the significant life domains," and "has difficulty meeting her own needs let alone those of her children." Dr. Swaner observed that despite significant state intervention for over two years, J.P.S.'s progress had been minimal. Dr. Swaner recommended that DFS consider possible termination of J.P.S.'s parental rights.

However, Dr. Jill Sanders, a licensed clinical psychologist, did not recommend termination of J.P.S.'s parental rights. She evaluated J.P.S. in 1994 and agreed that J.P.S. does not have the capacity to parent her children. Dr. Sanders concluded J.P.S. has "severe and long-standing psychiatric difficulties," and "only enough resources to keep herself functional." However, Dr. Sanders recommended the children be placed in a permanent placement allowing J.P.S. visitation. Dr. Sanders recommended that the duration of the visits be increased until she is capable of unsupervised but structured visitation. She testified that in the absence of some real risk from a parent, a total cutoff from biological parents is unnecessary. She further stated no such risk was present in this case. Dr. Sanders also did not find the distress exhibited by the children as a result

---

1. A proctor home is similar to a foster home, however, it provides more services.

of the visitations to be outside a "normal range."

Suzanne Copeland, an adoption worker with DFS, testified that adoption is better for children because the bonding is "better" than in less tenuous placements. She also testified that she had never heard of an arrangement such as Dr. Sanders recommended for five- and three-year-old children, nor does the State have the resources for such a long-term arrangement. Ms. Copeland testified that permanent foster care is never recommended for younger children and that only older children who are presumptively not adoptable are placed in long-term guardianships. Further, she testified that statewide there were twenty-five prospective adoptive parents for K.M.D. and K.A.D.

Trish Hartzell, a DFS caseworker and a licensed social worker, observed visits between J.P.S. and her children. She noted the oldest child, rather than J.P.S., cared for the younger children during many visits. Bridget Seese, a DFS caseworker, also observed visits between J.P.S. and her children. She testified that J.P.S. did not have a basic understanding of child care and had trouble responding to all her children. Cathy Castle, a DFS family preservation worker, likewise observed supervised visitations and assisted J.P.S. when the visits progressed to being unsupervised. She reported J.P.S.'s dependence on her during visitations did not decline over time. She was also concerned with J.P.S.'s paranoia, lack of basic child care skills, and inability to protect her children from further sexual abuse.

J.L.P., twelve years old at the time of trial, expressed a desire to stay with her proctor mother but also to know and visit her natural mother. J.L.P.'s proctor mother testified that she would prefer to adopt J.L.P., but whether or not adoption was possible she would be willing to permit J.L.P. to visit with J.P.S.

K.M.D. and K.A.D. were five and three years old respectively at the time of trial. Their foster parents did not testify at trial and it was unclear whether the foster parents were interested in adopting the children. Trish Hartzell testified that she was familiar with the children and their foster parents.

She testified that the children call their foster parents "mom" and "dad," and that the children relied more upon their foster mother during visitations than J.P.S. The juvenile court also found the children psychologically viewed their foster parents as their parents.

The juvenile court filed its Findings and Order on March 21, 1995, and filed its Amended Findings, Conclusions, and Order Nunc Pro Tunc on April 13, 1995. The court determined Dr. Sanders's recommendation for a permanent guardianship allowing visitations with J.P.S. was the best solution for all three children.

The court gave greater weight to Dr. Sanders's testimony than to the DFS personnel who testified because Dr. Sanders was more qualified as to children's psychological needs, and her "review of the record manifested careful reflection of the facts in this case; whereas [the other] testimony focused upon systemic practices and policies and begged the central question posed in this case as to what form of permanence is in the best interest of these children over the long term." The court also discounted the caseworker's testimony on the problems with permanent custody. Specifically, the court found "in a permanent custody/guardianship arrangement the custodian would not be told that the children could go back to parental custody, but that the arrangement would be permanent. This is in stark contrast to any care termed 'foster care,' and should open the door to more permanent attachments." The court determined the State failed to show by clear and convincing evidence that J.P.S. would pose a substantial risk to these children during visitations, or that it was in the best interest of the children to terminate all contact with J.P.S. The court therefore denied the State's petition to terminate J.P.S.'s parental rights.

The court went on to determine the children should be permanently placed in the custody and guardianship of custodial families to be screened and selected by DFS, with regular bi-monthly, supervised visits with J.P.S. DFS was to supervise visitation for a three-month period, at which time the

court would review the placements and visitations.

Eleven days after trial and the same day as the court entered its order, but prior to the time the parties were notified of the court's decision, the State learned the foster parents of K.M.D. and K.A.D. were willing to adopt the children. The State filed a Motion for a New Trial or to Alter or Amend the Judgment under Rule 59 of the Utah Rules of Civil Procedure based on newly discovered evidence, insufficiency of the evidence to justify the disposition, and that the disposition was against the law. The motion included affidavits from the younger children's foster parents and a bonding study evaluating the foster parents and the two children. The affidavits stated the children viewed the foster parents as their parents and the foster parents considered the children as their own and wished to adopt them. However, the foster parents also stated they would refuse to consider an arrangement with visitation to J.P.S. as ordered by the court. The bonding study also assessed the possible negative effects of moving the two children to a different family. The evaluator concluded the children had bonded with the foster parents and recommended that all visitation with J.P.S. cease. The evaluator also concluded a permanent custody arrangement allowing continued visitation with J.P.S. would be harmful to the children.

The juvenile court denied the State's motion. The State appeals the juvenile court's denial of its termination petition, the court's order granting permanent custody with visitation to J.P.S., and the court's denial of its motion for a new trial.

## ANALYSIS

### I. MOTION FOR A NEW TRIAL

The State argues the juvenile court abused its discretion when it denied the State's Motion for a New Trial or to Alter or Amend the Judgment pursuant to Rule 59 of the

---

**2.** Rule 59 allows the court to grant a new trial, take additional testimony, amend findings of fact and conclusions of law, or make new findings and conclusions. Utah R.Civ.P. 59.

**3.** Section 78–3a–46 provides:

Utah Rules of Civil Procedure. Specifically, the State claims K.M.D. and K.A.D.'s foster parents' post-trial notification to the State that they were willing to adopt the children and the results of the subsequent bonding study, constituted newly discovered evidence that the State could not have produced at trial and that was materially relevant to the outcome of the case.

The juvenile court denied the State's motion on the grounds that the evidence did not exist at the time of trial and that the State did not seek a continuance or raise the issue of surprise at trial. We afford the juvenile court "a wide range of discretion" to grant or deny a motion for a new trial, *see State v. James*, 819 P.2d 781, 793 (Utah 1991), and we "assume that the trial court exercised proper discretion unless the record clearly shows the contrary." *Id.* Nevertheless, under the unique facts of this case, we conclude the juvenile court abused its discretion in denying the State's Motion for a New Trial.

We have not dealt with the denial of a Rule 59 motion[2] in the unique setting of a juvenile court proceeding to terminate parental rights and to determine what placement is in the best interest of children under the juvenile court's jurisdiction. However, we have noted that to effectively determine the best interests of a child, the juvenile court needs continuing jurisdiction, and thus must be "free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy." *State ex rel. J.J.T.*, 877 P.2d 161, 164 (Utah App.1994). This principle, coupled with the equitable nature of juvenile court proceedings, supports a less stringent notion of finality. *See State ex rel. L.D.S. v. Stevens*, 797 P.2d 1133, 1137 (Utah App.1990).

Section 78–3a–46 of the Juvenile Court Act allows any adult affected by a decree in a juvenile's proceeding to petition the court for rehearing.[3] In *In re S.R.*, 735

---

A parent ... of any child adjudicated under this act, or *any adult affected by a decree in a children's proceeding under this act,* may at any time petition the court for a new hearing on the ground that new evidence which was not

P.2d 53, 57–58 (Utah 1987), the Utah Supreme Court recognized this section's similarity to Rule 59 and found the traditional Rule 59 rubric helpful to its analysis. The court concluded that

> [a]lthough there is no case law specifically addressing section 78–3a–46 on the issue of what constitutes new evidence, there is an abundance of case law addressing this issue as it relates to newly discovered evidence for purposes of retrial under Rule 59(a)(4), Utah Rules of Civil Procedure. In addition to the definitional similarities between the statute and the rule, the policy reasons behind them are also similar.... Because the language and the policies behind the statute and the rule are substantially similar, case law interpreting 'newly discovered evidence' for purposes of Rule 59(a)(4) is helpful in interpreting 'new evidence' for purposes of section 78–3a–46.

*Id.* at 57 (footnote omitted). We thus use a traditional Rule 59 approach only as a general guide to our analysis of whether the juvenile court's denial of the State's Motion for a New Trial was an abuse of discretion.

■ Under established Rule 59 case law, the moving party must prove the evidence offered meets three requirements for a new trial to be granted. *Id.* at 57–58. "First, it must be material, competent evidence which is in fact newly discovered. Second, it must be such that it could not, by due diligence, have been discovered and produced at trial." *Id.* at 58. "Finally, it must not be merely cumulative or incidental, but must be of sufficient substance that there is a reasonable likelihood that with it there would have been a different result." *Id.* Additionally, "[n]ewly discovered evidence must relate to facts which were 'in existence at the time of trial.'" *In re Disconnection of Certain Territory*, 668 P.2d 544, 549 (Utah 1983) (citation omitted); *see In re S.R.*, 735 P.2d at 58.

■ In this case, the State presented competent evidence of K.M.D. and K.A.D.'s fos-

ter parents' willingness to adopt and their bonding with the children. Despite repeated attempts before and during the time of trial to get a definite response from the foster parents, the State did not learn until eleven days after trial that the foster parents were definitely willing to adopt. Therefore, a bonding study performed in advance of trial would have been futile. Considering the continuing jurisdiction the juvenile court enjoys to determine the best interests of children, we conclude this evidence was newly discovered, and could not, through due diligence, have been produced at trial.

■ Furthermore, this evidence is not merely cumulative. The juvenile court specifically expressed in its findings that it had "some concern over whether the foster parents ... would be willing to adopt both children," and that "[t]he present foster home as a prospective adoptive home is in serious question and no evidence was presented to clarify the issue." The State's newly discovered evidence would have alleviated this concern by clarifying the foster parents' willingness to adopt. This is particularly true in light of the foster parents' affidavits stating they would not agree to the permanent guardianship remedy fashioned by the court. Evidence of this nature is critical to a determination of the children's best interests. Moreover, we cannot say the court would not have wanted to reconsider its order as to J.L.P. in light of the new evidence affecting the placement of the child's siblings. Because of the uncertainties present in this case and the court's unusual dispositional order, we conclude the new evidence provided by the State could have resulted in a different outcome.

■ Additionally, the issue of whether the foster parents were willing to adopt was at issue at the time of trial and thus the newly discovered evidence relates to facts in existence at the time of trial. Namely, it was

---

known or could not with due diligence have been made available at the original hearing and which might affect the decree, has been discovered. If it appears to the court that there is such new evidence which might affect its decree, it shall order a new hearing and

enter such decree and make such disposition of the case as is warranted by all the facts and circumstances and the best interest of the child.
Utah Code Ann. § 78–3a–46 (1992) (emphasis added).

unclear whether the foster parents were willing to adopt.

Our conclusion under Rule 59 is affected by the nature of juvenile court proceedings. The Termination of Parental Rights Act allows the State or any interested party, including a foster parent desiring to adopt, to file a petition for the termination of parental rights. *See* Utah Code Ann. § 78–3a–404 (Supp.1995). Thus, the State could simply refile a petition to terminate J.P.S.'s parental rights and include the information as to the foster parents' willingness to adopt and the bonding study in that new petition. *People ex rel. J.R.,* 711 P.2d 701, 703 (Colo.Ct.App. 1985) (holding res judicata does not prohibit State from filing subsequent petition to terminate parental rights after first petition is denied when additional facts arise); *In re A.S.,* 12 Kan.App.2d 594, 752 P.2d 705, 711 (1988) (finding State can bring subsequent termination petitions because parental unfitness remains "open for future review"). Allowing a liberal application of Rule 59 seems a more efficient remedy.

■ In summary, we conclude the trial court abused its discretion in denying the State's Motion for a New Trial. We therefore remand for a new trial.[4]

## II. RELEVANT CONCERNS FOR REMAND

We reach several other issues on appeal in the hope that our discussion will be helpful on remand. We share the State's concern that the juvenile court's dispositional order went beyond the court's statutory authority, was based upon a legal confusion as to the nature of a permanent guardianship, and was not contemplated by the policies or provisions of Utah's child welfare laws. Because these issues will arise on remand, we address them to assist the juvenile court. Utah R.App.P. 30(a) ("If a new trial is granted, the [reviewing] court may pass upon and deter-

mine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case."); *see also State v. James,* 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.").

### A. Statutory Authority

■ First, the State argues Utah law does not authorize the disposition crafted by the juvenile court. Under the Juvenile Court Act, the juvenile court has jurisdiction in proceedings "to terminate the parent-child relationship in accordance with [the] Termination of Parental Rights Act." Utah Code Ann. § 78–3a–16(1)(f) (Supp.1995). The Termination of Parental Rights Act provides:

*Upon entry of an order terminating the rights of the parent* ..., the court may: (a) place the child in the legal custody and guardianship of a licensed child placement agency or [DFS] for adoption; or (b) make any other disposition of the child authorized under Section 78–3a–39 [of the Juvenile Court Act].

*Id.* § 78–3a–411 (emphasis added). Additionally, section 78–3a–406 of the Termination of Parental Rights Act provides that after a petition for termination has been filed, "[a] hearing shall be held *specifically* on the question of termination of parental rights." *Id.* § 78–3a–406 (emphasis added). The State argues these provisions allow the juvenile court to make a disposition under section 78–3a–39 of the Juvenile Court Act only *after* the court has entered an order terminating parental rights.

In *State ex rel. Kelsey,* 20 Utah 2d 131, 434 P.2d 445, 446 (1967), the juvenile court treated a petition for leave to adopt as a petition for termination of a father's parental rights in a child who had been in foster care. The juvenile court then entered an order awarding custody and control of the child to the father. *Id.* The Utah Supreme Court, con-

4. Our colleague in dissent would rather summarily reverse the juvenile court as a matter of policy. We refrain from this result for two principal reasons. First, an appellate court should, when possible, give legal direction to the trial court and then allow that court the opportunity to cure its initial order. The trial court, as the trier of fact, is in the best position to apply the facts to the law. This is particularly true in the unique setting of the juvenile court. Second, we are hesitant to set an unbending rule on permanency that may be problematic for the juvenile court in future cases.

struing section 55–10–109 of the Utah Code, the predecessor to the current Termination of Parental Rights Act, concluded "that under the provisions of that statute the [juvenile] court was only authorized to determine whether or not the parental rights should be terminated." *Id.* The court then concluded the order "went beyond the authority granted by the statute," and so reversed and remanded the case to juvenile court for further proceedings. *Id.* For guidance on remand, the court noted it had "no quarrel with the decision of the court in its determination that upon the evidence before it the rights of the [natural parents] should not be terminated." *Id.* However, if the father wished to gain custody of the child, he would have to proceed under the provision allowing a modification of the previous custody order and show a change in circumstances to justify a new order. *Id.*

Although almost thirty years has passed and the Act has increased substantially in size, the relevant provisions remain nearly identical to those dealt with in *Kelsey.* *See also State ex rel. R.N.J. v. M.M.J.,* 908 P.2d 345, 348–49 (Utah App.1995) ("The Juvenile Courts Act specifically separates termination of parental rights proceedings and custody proceedings."). Therefore, on remand, the issue of termination of parental rights and what custody arrangement is in the best interest of the children should be handled in compliance with the procedures provided for in the Juvenile Court Act and the Termination of Parental Rights Act.

### B. Nature of Permanent Guardianship

Next, we agree with the State that the juvenile court was operating under a mistaken view of the law in concluding a permanent guardianship offers the same degree of permanency as a termination of parental rights and adoption. The juvenile court specifically found that "the permanent custodians would *not* be told the child could go back to the parents because the arrangement is permanent," that permanent guardianship should "open the door to more permanent attachments," and that "permanency does not take only one form, adoption."

However, the statutory provision allowing for an order of permanent custody states the custody order "may be modified by petition or motion as provided in Section 78–3a–47." Utah Code Ann. § 78–3a–39(y)(i), (ii) (Supp. 1995). Section 78–3a–47 allows a parent "whose legal custody has been transferred by the court to … petition the court for restoration of custody or other modification … of the decree, on the ground that a change of circumstances has occurred." *Id.* § 78–3a–47; *see State ex rel. T.H. v. R.H.,* 860 P.2d 370, 374 (Utah App.1993) (referring to permanent custody under section 78–3a–39 as "temporary"). The court's determination that the permanent guardians would be told J.P.S. could not regain custody of her children is contrary to law. J.P.S. could repeatedly petition under section 78–3a–47 to regain custody of her children.

In addition, although the children may not be subjected to as many different placements in a permanent guardianship arrangement as compared to foster care, as the juvenile court recognized, the children's guardians could still decide to "bail out." The guardians would be free to discontinue the guardianship arrangement, for example, if the severity of the children's problems increased, or they became frustrated with the visitation arrangement with the natural mother.

Because many of the juvenile court's conclusions appear to be based on the "permanency" of the placements, on remand, the true nature of "permanent guardianship" should be considered and factored into the court's determination of the best interests of the children.

### C. Policy Concerns

Finally, even more troubling, is that the juvenile court's dispositional order does not seem to be contemplated by the policy of Utah's child welfare laws. In defining the purpose of these acts, the legislature provided: "In keeping with its ultimate goal and purpose of protecting children, … when … reasonable efforts to maintain or reunify a child with his [or her] family has failed, [DFS] shall act in a timely fashion … to provide the child with a stable, permanent environment." Utah Code Ann. § 62A–4a–

103(2)(b) (Supp.1995). Also, "throughout [DFS's] involvement, [DFS] shall ... ensure that children are brought up in stable, permanent families." *Id.* § 62A–4a–201(3). Thus, the overriding policy concern is to achieve permanency for these children, especially once a parent is determined unfit.

Given this goal of permanency, the provisions seem to contemplate one of two alternate routes—reunification or termination.[5] In the instant case, J.P.S. was found unfit and incapable of ever parenting her children even after the State had provided extensive services to reunify the family. Nonetheless, the court placed the children in a guardianship arrangement and allowed J.P.S., an unfit custodial mother, continued visitation. As a result of the mother's need for supervised visitation, the children will remain in the system indefinitely. Additionally, as stated above, in light of the nature of permanent guardianship, the children also will not gain a truly permanent environment. These policy concerns should be considered on retrial.

### CONCLUSION

We conclude the trial court abused its discretion when it denied the State's motion for a new trial. Therefore, we remand for a new trial consistent with this opinion.

JACKSON, J., concurs.

ORME, Presiding Judge (dissenting):

I respectfully dissent. I believe the trial court erred as a matter of law in placing the two younger children in a permanent state of limbo, which is simply not the kind of permanency the law is intended to promote. My colleagues compound that problem by sending the matter back for unnecessary further proceedings, which are likely to extend the period of uncertainty in these children's lives by many months.

DFS proved by clear and convincing evidence that the children's mother was an unfit parent despite substantial efforts by DFS to rehabilitate her. The trial court clearly

erred in basing its decision on Dr. Sanders's peculiar recommendation, premised on questionable theories especially when applied to children so young and so long removed from the custody of their parent. Such a recommendation is at odds with the policy concerns correctly identified in the main opinion and is not contemplated in the applicable statutes, also as explained in the main opinion.

Without even getting to the question of whether the motion for new trial should have been granted, I would, therefore, simply reverse the trial court's judgment with respect to the two younger children and direct that the mother's parental rights be terminated.

The older child presents a different situation. For several reasons—her own abuse of the younger children, the considerable age difference, the fact she has a different father, the fact her foster placement has always been in a different home than where the younger two were placed—this is not a situation where keeping all three children together is necessary or desirable. Indeed, no one seems to have even suggested it. Nor does their legal status have to be in lockstep. As an older child with an existing relationship with her mother and a desire to continue that relationship, the need for continuity and a measure of stability in her life may well be enhanced by an arrangement of the sort the trial court decreed. Remaining with a loving proctor mother who can better fulfill her daily needs, while continuing a relationship with her natural mother, seems to make sense.

For the older child, whose status was in no way put in issue by the motion for new trial, the only question, then, is whether such a sensible arrangement is legally permissible. Given the discussion in the main opinion, it appears this exact "permanent guardianship" arrangement, in the absence of termination of parental rights, is not specifically authorized by statute. But as long as the entire matter is being remanded anyway, I am content to join my colleagues in remanding the older child's case to give the trial court a

---

5. Furthermore, "[w]ith regard to a child who is three years of age or younger, if the goal is not to return the child home, [DFS's] goal or permanency plan for this child *shall* be adoption unless there are extenuating circumstances that justify long-term foster care or guardianship." Utah Code Ann. § 62A–4a–205(7) (Supp.1995).

chance to devise a disposition that will accomplish the underlying purposes the court had in mind without running afoul of statutory directives.